1        UNITED STATES OF AMERICA
         UNITED STATES DISTRICT COURT
2        CENTRAL DISTRICT OF CALIFORNIA
              WESTERN DIVISION
3
              - - -
4        HONORABLE CHRISTINA A. SNYDER
    UNITED STATES DISTRICT JUDGE PRESIDING
5             - - -

6
    UNITED STATES OF AMERICA,    )      ORIGINAL
7
              PLAINTIFF,         )
8
    VS.                          )      CASE NO: CR
9                                )      02-00003(B)-CAS
    KHALIL MOHAMMED,             )
10                               )
              DEFENDANT.         )
11                               )
    _____)

12

13

14

15            REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                MONDAY, AUGUST 15, 2005

17                LOS ANGELES, CALIFORNIA

18

19

20

21

22            LAURA MILLER ELIAS, CSR 10019
              FEDERAL OFFICIAL COURT REPORTER
23            312 NORTH SPRING STREET, ROOM 453
              LOS ANGELES, CALIFORNIA 90012
24                PH:  (213)620-0890

25

U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

NOV - 6 2006

FILED, DAWN
RECORDS

DOCKETED ON CM

NOV - 7 2006

BY

067

```
 1

 2    APPEARANCES OF COUNSEL:

 3    ON BEHALF OF PLAINTIFF:

 4            DEBRA W. YANG
              UNITED STATES ATTORNEY
 5
              BY:  MICHAEL STERN
 6            ASSISTANT UNITED STATES ATTORNEY

 7            1100 UNITED STATES COURTHOUSE
              312 NORTH SPRING STREET
 8            LOS ANGELES, CA 90012

 9


10
      ON BEHALF OF DEFENDANT MOHAMMED:
11

12
              DAVID KATZ, ESQ.
13

14

15

16

17

18

19

20

21

22

23

24

25
```



INDEX


PROCEEDINGS                        PAGE


SENTENCING                         4

UNITED STATES DISTRICT COURT

```
1        LOS ANGELES, CALIFORNIA; MONDAY, AUGUST 15, 2005; 2:40 P.M.

2                            - - -

3              THE CLERK:  Calling Calendar Item 17.

4              Case No. CR 02-3(B).

5              United States of America versus Khalil Mohammed.

6              Counsel, please state your appearances.

7              MR. STERN:  Good afternoon, Your Honor.  Michael

8     Stern appearing on behalf of the United States.

9              THE COURT:  Good afternoon.

10             MR. KATZ:  Good afternoon, Your Honor.  David Katz

11    appearing with and for Mr. Khalil Mohammed who's present in

12    custody.

13             THE COURT:  All right.  Good afternoon, everybody.

14             Okay.  It appears that the presentence report was

15    disclosed on August 18, 2004.  Since that time, there has

16    been an addendum to the presentence report.  In addition,

17    there are numerous filings I think beginning with the

18    responses and objections to the presentence report by the

19    defendants followed by the response to the PSR addendum and

20    objection by the defendants.  And then there was the

21    government's response to Khalil Mohammed's sentencing

22    memorandum and motion for sentence reduction, and then there

23    was a reply to the government's response which was filed

24    August 15th.

25             Does that appear to cover everything, Mr. Katz?
```

1          MR. KATZ:  Yes, Your Honor, except I believe the

2     last motion was filed last Friday which was the 12th.

3          THE COURT:  Right.  No, I meant your reply is dated

4     the 15th.  His motion was the 12th, you're exactly right.

5          MR. KATZ:  I --

6          THE COURT:  I have something from you that shows

7     filed August 15th.

8          MR. KATZ:  Oh.  Anyway, I had filed the reply on

9     the 12th, and I thought the Court got a courtesy copy late

10    Friday afternoon.

11         THE COURT:  I didn't get it until today.  It's

12    dated the 12th, but it was filed on the 15th.  The filing

13    stamp is the 15th, but I've reviewed it anyway.

14         MR. KATZ:  Oh, thank you very much, Your Honor.  I

15    think it was lodged that day because of the in camera aspect

16    of it.

17         THE COURT:  Right.  Okay.  Now, I'm sure, Mr. Katz,

18    you've had an opportunity to review the government's position

19    and the presentence report with your client; is that correct?

20         MR. KATZ:  Yes, we have, Your Honor.

21         THE COURT:  Okay.  And do you have any additional

22    corrections or objections to the presentence report?

23         MR. KATZ:  Your Honor, may I just address those

24    briefly?

25         THE COURT:  Sure.

```
1           MR. KATZ:  Your Honor, the first thing I would like

2    to do very briefly if I might just because they have come a

3    long way, and I'd just like to acknowledge the Atrash family

4    who's here.

5           THE COURT:  Yes.

6           MR. KATZ:  And this is Mr. Adly Atrash and Mrs.

7    Quadre Atrash.  And I'll render every name mispronounced in

8    Arabic so I apologize to everyone.  And then there's Fallal

9    Atrash and also, I guess, Jameen Atrash, Adele and Haneen

10   Atrash.  Also, Rasha Atrash is here, and she's actually the

11   sister, Your Honor, of Isa Atrash who's before the Court.

12   These two people, the husband and wife, are the parents of

13   Mr. Isa Atrash and of his sister, Rasha.

14           And also in court, Your Honor are the following

15   children all with the last name Mohammed:  Iesha Mohammed,

16   Duowa, Akram, Allah, Safah, Fameda, Merad, Momen and Elham.

17   And then this is a cousin present behind me, Your Honor.

18           THE COURT:  All right.

19           MR. STERN:  And Your Honor, it always seems like in

20   sentencing remarks, we start with what's probably not the

21   most important thing, but it is required, and those are the

22   objections to the presentence report itself.  So if I could

23   briefly touch on those, they're at pages 8 to 11 of the

24   presentence report.

25           THE COURT:  All right.
```

1    MR. STERN:  Your Honor, could I ask you a favor?

2    Your name plate shines right in my eye.  Thank you,

3    Your Honor.

4        Your Honor, the first one are the alleged akas, and

5    I would ask that the Court strike the aka Khalil Ashur.

6    There hasn't been any submission by either the government or

7    the probation office refuting my request in this regard, and

8    my request was made back on July 12th.  So I would ask that.

9    And we could prepare these all in writing, Your Honor, but I

10   think I have to put them on the record here at the hearing.

11   THE COURT:  Okay.

12   MR. STERN:  I would ask that that aka be stricken,

13   and that it simply be explained that the others are not

14   illegal or criminal akas, but that they're things like in

15   Arabic, I know the Court knows this from its experience in

16   this case and others, but Abu -- if a man has --

17   THE COURT:  The eldest son of --

18   MR. STERN:  Eldest son, right.  Then he's know as

19   Abu, the father of the eldest son's first name.  And also

20   people are known by the town they're from so Khalil Al Tarife

21   means Khalil from the town of Tarife.

22       Your Honor, the second one is a reference to

23   Abdallah, and it just should be clarified in the PSR that

24   that's a reference to Mr. Mohammad Abdallah and not to

25   Abdallah Ayyeh, Mr. Mohammed's brother.

1          The third one is a reference to the alleged threat,

2     and we may have some more discussion about this later on, but

3     it's our position that the threat should be deleted from the

4     presentence report.  And while the government's addressed

5     this issue, they haven't addressed it in terms of our request

6     made over a month ago to delete it from the presentence

7     report.

8          And our position is just this, Your Honor.  This is

9     a judgment call.  It's something that's within the Court's

10    discretion.  If Mr. Mohammed has a period of time left to

11    serve in an institution, Your Honor, that could really affect

12    his designation.  And after all he's been through, I think

13    having that threat in there and having to try to explain it

14    and then having a counselor who gets it, we can avoid the

15    whole problem by simply deleting it.  I'm not asking that the

16    Court cannot consider it for whatever arguments Mr. Stern

17    wants to make with regard to what the sentence ought to be.

18    I'm just asking right now that you delete it from the PSR.

19         The next one, Your Honor, is his prior arrest, and

20    this actually has not been opposed either in the addendum or

21    in the government filing.  The prior arrest was 14 years ago.

22    It was a mere arrest.  Again, I have the same concern for

23    institutional placement with regard to Mr. Mohammed that

24    because somebody could think that he hit somebody, that that

25    could somehow make him designated not to a camp.

UNITED STATES DISTRICT COURT

```
 1          And the last which there's also been no objection
 2   from presentence which is gratifying because it's sort of
 3   their issue and none from the government in its position last
 4   Thursday is this thing about that he did not make all
 5   requested financial disclosures because he had no access to
 6   the documents.  He has no assets, and he's been in custody,
 7   not that there was any refusal or desire not to comply.
 8          And that's an important point because one of the
 9   things we're gonna argue is extraordinary post-offense
10   rehabilitation.  And I don't want the Court to think that in
11   one wit, he was not compliant with probation because I
12   understand he was completely compliant with them.
13          Those are my only comments on the report,
14   Your Honor.
15          THE COURT:  Okay.  Why don't we just start with
16   Mr. Stern's response.
17          Do we care about striking the aka?
18          MR. STERN:  I don't care except to the extent that
19   somehow the Bureau of Prisons has akas that allow them to
20   create segregation orders.  The reason that we had the akas
21   is because many of the witnesses that we had and during the
22   course of the tapes, the defendant was identified as those
23   akas.  Frankly, I don't think they are damning or will cause
24   the defendant problems so it essentially doesn't matter to
25   me.  I don't know, however, if it will assist BOP in their
```

```
 1    separation orders.

 2              THE COURT:  I would doubt that it would but --

 3              MR. STERN:  I'm not sure why they're problematic

 4    for defense counsel.  It's not like Khalil Mohammed aka Jack

 5    The Ripper.

 6              THE COURT:  Well, I understand the issue, but I'm

 7    just trying to get your position on them.

 8              As far as clarifying that Abdallah means Mohammad

 9    Abdallah?

10              MR. STERN:  I think that's correct.

11              THE COURT:  Okay, so we're going to direct that

12    that change be made for sure.

13              The question of the threat, deleting it from the

14    PSR, what is the government's position on that if you can

15    argue it?

16              MR. STERN:  Sure.  We object to deleting accurate

17    information from the PSR.

18              THE COURT:  Okay.

19              MR. STERN:  To the extent that BOP tries to figure

20    out a defendant's background and how they think should

21    classify them, the threat is what it is, and to the extent

22    that the Court wanted to know for itself exactly what the

23    threat was, we included the transcript.

24              THE COURT:  I understand.  I understand.

25              The prior arrest?
```

1          MR. STERN:  Again, I think part of what BOP uses is

2     a defendant's prior background to determine how they can

3     calculate how he might act in the future.  Certainly, the PSR

4     discusses how long ago the offense was, and BOP will be able

5     to take that into consideration.  Essentially what defense

6     counsel is asking is that things that are or may be perceived

7     as detrimental to defendant even though they're accurate be

8     deleted, and we do not think that's appropriate to do.

9          THE COURT:  Okay.  And then finally, the statement

10    that the defendant didn't make all required financial

11    disclosures?

12         MR. STERN:  I don't know the answer to that.

13    That's exclusively a determination by probation.  I wasn't

14    part of that process.

15         THE COURT:  All right.

16         MR. KATZ:  Just a very brief reply.  Probation

17    didn't come back on that point in the addendum.  I think that

18    that's pretty conclusive.

19         Your Honor, arrests mean nothing.  There are a

20    hundred, maybe there's a thousand cases that hold that

21    arrests are absolutely meaningless.  They mean nothing, Your

22    Honor, and yet somehow if he pulls the wrong person in

23    prison, this will be held against him.  And I agree that if

24    it connotes some meaningful information, maybe that

25    distinguishes it from the threat although I would ask you to

1    use your discretion regarding the threat.  There's tape of

2    the threat.  This arrest is totally bogus from 14 years ago.

3    It means nothing.

4              THE COURT:  Well, I understand that, but I'm not

5    going to start interfering with the presentence report.

6    Obviously, you can take the matter up with BOP officials.

7              I'm not sure that there's any value in striking the

8    aka.  I don't think it has pejorative effect that you do,

9    Mr. Katz.

10             I'm not going to direct that the threat information

11   be deleted, and I'm not gonna direct that the prior arrest be

12   deleted.

13             As far as the required financial disclosures, I'm

14   going to let you argue.  Obviously, it's for extraordinary

15   post-sentencing rehabilitation.  I'm not sure it applies

16   here, but certainly you ought to be able to argue it.  But I

17   think the fact of the matter is depending upon the -- you

18   know, what you argue, the objection to the financial

19   disclosure information may be mooted by my ruling.

20             So let's assume that all I'm prepared to do right

21   now is to concede that -- and state for the record that the

22   Abdallah referred to is Mohammad Abdallah.  I don't think

23   there's a need to correct the presentence report because I

24   don't think it's going to have any impact.  Otherwise, I'm

25   gonna let the sentencing report stand.

1          MR. KATZ:  Okay.  Your Honor, I guess the record

2     will reflect this whole course of events, and the Court, of

3     course, understands that the probation, I thought what they

4     said was kind of ambiguous.  I made it clear that it wasn't

5     an unwillingness to comply, and they never came back and

6     said, you know, Mr. Katz is wrong, there was unwillingness.

7     I think we're all kind of agreed that there was no

8     unwillingness.  But it really doesn't matter to the BOP.  It

9     matters to Your Honor, and I think Your Honor gets it.

10          THE COURT:  I understand.  And the real point here

11     which we resolved by the government's position, and I would

12     have gone with the plea anyway, is the plus 2 versus the plus

13     3, and that seems to have resolved itself and become a moot

14     point by virtue of the fact that the government concedes that

15     it's going to stand by the plea, and that's exactly what I

16     would have done in any event.  So that to me is the most

17     significant issue in the presentence report which seems to

18     have resolved itself.

19          MR. KATZ:  And I want to say, Your Honor, because

20     there was a lot more heat than light to some extent in the

21     exchange between Mr. Stern and myself that I am gratified on

22     behalf of my client that they recognized and are endorsing

23     only plus 2 for the role and also the safety valve.  Because

24     what that means is we're only arguing about the difference

25     between the 5 points that they're recommending for 5K1 and

1   our position that really more 5K 1 points are merited in this

2   case, and also that there are some Booker factors.  So I

3   think maybe I should go to the 5K1 first.

4            THE COURT:  I think that that would be the thing to

5   do, yes.

6            MR. KATZ:  Your Honor, a defense attorney's always

7   at a disadvantage in this situation, and I don't envy the

8   Court in this regard because you have a defense attorney who

9   says, I believe that the cooperation was more, and then the

10   government says, well, no, we believe it's worth 5, and we're

11   the government, and we've had an overview over this whole

12   situation.

13            And that's one reason why particularly in this case

14   because I was so concerned even before we negotiated the plea

15   that we were going to be right here having an argument where

16   I would consider the government's position to be ungrateful

17   or miserly and unfair to Mr. Mohammed that I tried to keep

18   pretty close records of what was going on.

19            And I went to these meetings even though there were

20   lots of days I'm sure the Court can imagine where I had some

21   retained client or something else that I was really eager to

22   do that day, but I really made an effort to go to hours and

23   hours of Mr. Mohammed's cooperation sessions.

24            I got one thing wrong in the pleading I filed over

25   a month ago.  He did not speak face-to-face with Mr. Alasoud.

UNITED STATES DISTRICT COURT

1    I apologize.  But Your Honor, he did speak face-to-face with

2    six different people.

3         Now, the government basically is saying that

4    Mohammad Hammad -- the cooperation he gave regarding Mohammad

5    Hammad was extremely valuable, and the cooperation he gave

6    regarding Mr. Musitef was extremely valuable.  And I can't

7    swear that.  I have some other things that he did that

8    they're giving him no credit for.

9         But Your Honor, I can't square that with 5 points.

10   If you look at the reality of this situation where people

11   like Hamayel and Khahallah and Shabib were not recommended

12   anything for role by the government, that is the sub rosa in

13   effect minus 2 5K1 added on to the 9 or 10 points that the

14   government recommended for them.  Now you're really looking

15   at people who had the same role as Mr. Mohammed, and

16   therefore, you're looking at people who got effectively 10,

17   11, 12 points.

18        So how in the context of that could he get only 5?

19   There is really only one reason, Your Honor.  There's only

20   one reason for the government.  And I was in one of the

21   sentencing of his brother where you said let's get real.  So

22   let's get real.  They want to send a message to the defense

23   bar, particularly this Assistant U.S. Attorney wants to send

24   his message to the defense bar, plead your client early,

25   early, early.  Make my life easy.  And there's a lot more to

1   justice than that.  We'll get to that in a second, some of

2   the many reasons that Mr. Khalil Mohammed did not plead

3   guilty early on.

4           But the biggest problem from a point of view of

5   justice of a person who doesn't plead guilty early is that he

6   or she doesn't have an opportunity to help much.  Mr.

7   Mohammed pleaded guilty and started his efforts to help the

8   government in plenty of time to help an extraordinary amount.

9   I saw it.  The court and the government got the benefit of

10  it.

11          Mr. Musitef was a man on his way to trial.  He was

12  gonna sit here for weeks like Said Abdelaziz and his brother

13  did.  That is a detriment to the system.  This is a scarce

14  resource, Your Honor, and there's nothing wrong with treating

15  federal trial time like the very scarce resource it is.  And

16  Mr. Mohammed saved that to the judicial system, and he saved

17  this to the prosecutors because Musitef was gonna go to

18  trial.

19          And Mr. Mohammed, he was diligent, he was

20  thoughtful, he put himself out there.  He said, what's going

21  to work here?  I went through the tapes with the government,

22  that's what they wanted, but you know what helped even more

23  than what the government's asking for?  If I actually sat

24  down with Mr. Musitef so Mr. Stern to his credit arranged it,

25  the two of them sat down.  There was a concern that the

1    lawyers might get in the way so the two of them sat in a room

2    in the U.S. Attorney's Office, Mr. Musitef who was out on

3    bail and Mr. Mohammed who was in custody.

4         Now, did he plead guilty the next day?  No, but he

5    did plead guilty.  And I spoke with his attorney, Mr. Treman,

6    and I explained the things.  And, you know, the defense in

7    these cases, Your Honor, is not, I didn't sell boxes.  It

8    wasn't that I wasn't there.  That's when the government says,

9    oh, their case is so overwhelming.

10        The issue that's interesting in these cases because

11   it's not cocaine or heroin or something like that is do you

12   have a specific knowledge beyond a reasonable doubt that it's

13   going to be used, not in some grain market, not for diet

14   pills, but that it's gonna be used to make methamphetamine.

15   And he explained clearly and I explained clearly to Mr. Mr.

16   Musitef's attorney that his defense that he merely moved

17   boxes without knowledge was never gonna wash.  And that's

18   what brought Mr. Musitef around.

19        They also acquired information from my client about

20   Mr. Musitef's son, and that was a really sad situation.

21   Because I can tell you that whatever the Court thinks of this

22   record, my client has impressed me over 3-and-a-half years as

23   someone with a really big heart who cares about other people.

24   And it was a tragic situation.  Musitef was an older man who

25   knew what he was getting into.  But his son?  And Mr.

1    Mohammed was not enthusiastic about helping in that regard,

2    but the truth is the truth.  And he identified the

3    information he had about Mr. Ehab, Musitef's son, and

4    thereafter in my recollection of the chronology, Mr.

5    Musitef's son was indicted.

6            Let's talk about Mohammad Hammad for a minute, Your

7    Honor.  Mr. Mohammad Hammad.  This was kind of a mess, and I

8    sort of understand through the grapevine that Mohammad

9    Abdallah wanted to make it more of a mess at certain times.

10   But I had represented Mr. Mohammad Hammad in the state court

11   years ago.  And Mr. Mohammed was concerned if there was going

12   to be any kind of problem, and we spoke it through, and I

13   understand he wrote a letter, and talked it through with

14   independent counsel, Your Honor, and he came to the

15   conclusion that he was comfortable with the situation.

16           When it comes to Mr. Mohammed, whatever he may say,

17   he was comfortable with the situation because he's had a

18   series of lawyers and he could have come to the Court and

19   said, look, I'm not comfortable with Mr. Katz having

20   represented me years ago in the state court and now

21   representing Khalil Mohammed.  But Khalil Mohammed had a duty

22   in this case, and he was gonna live up to this agreement

23   letter and spirit in every way that he could so he said,

24   well, this is the way it is.

25           Now, here's the interesting thing, Your Honor.  He

1    had actually said to the government before when we had all

2    these sessions about Musitef, and we spent so much time on

3    Musitef, he said, aren't you interested in Mohammad Hammad?

4    I mean, he was my big customer, he was the guy I was selling

5    to all the time, he's on these tapes, I can identify his

6    voice, but he's not even charged.

7         And there was really a lack of interest, and it

8    surprised us.  But his job is not to run the cooperation.

9    It's the government's job to run the cooperation.  So he did

10   what he was asked, and although he volunteered that and said

11   he was willing to do that, the focus was on Musitef and

12   Musitef's son.

13        But what happened was Mohammad Hammad was arrested

14   one day.  I think it was a little bit before Election Day

15   2004.  And he was going to try to get bail, and they wanted

16   Mr. Mohammed to help out with that.  He dropped everything.

17   He was at the MDC going through the tapes and working on

18   that, and I dropped everything as much as I could, and we

19   went through that.

20        And first way the government used that was to deny

21   bail to Mr. Mohammad Hammad.  I've read the transcript.  And

22   they made a big point -- the government here made a big point

23   in front of Magistrate Judge Mc Mann.  They've said, look,

24   we've got a person close to him, we've got a person who's

25   cooperating, we've got a person who's identified very

1    incriminating calls.  That was that Mr. Mohammed did at the

2    drop of a hat hour after hour after to help the government

3    first deny bail to Mr. Mohammad Hammad.  After that, he went

4    through and found the most incriminating tapes.

5         Now, whatever Mohammad Hammad wants to say now to

6    try to maybe deny him points or back bite or whatever, Your

7    Honor, the reality is not only was he prepared to testify,

8    and Mohammad Hammad knew it, but if Mr. Mohammad Hammad says,

9    boy, those tapes were powerful, they were a big part of my

10   inducement, they were powerful because the government didn't

11   have to cull through hundreds and hundreds of tapes, Your

12   Honor.  They were focused right on the four or five that most

13   heard Mr. Mohammad Hammad.

14        I understand that Mr. Hammad has since pleaded

15   guilty.  And he was someone else who was talking about going

16   to trial and wanting a speedy trial and this and that and the

17   other thing, and that saved the court -- and I don't think

18   anyone was more instrumental -- I would submit to the Court

19   nobody more instrumental, and I think record shows this, in

20   avoiding two separate because they were two very separately

21   positioned people in different transactions than Mr. Mohammed

22   who weighed in and really induced the guilty pleas in both of

23   those cases.  That's the record.

24        But Your Honor, beyond those 5 points, and I think

25   that's worth more than 5 points, but there's his brother.  I

1    was so pleased that I had a chance to sit here last week,

2    frankly, I was pleased for my client that Your Honor had a

3    chance to see Mr. Abdallah Ayyeh and his attitude toward

4    pleading guilty.  My client went through -- what this court

5    went through for however many minutes it was, he went through

6    that for months.  He went through that for months.

7          And Abdallah Ayyeh as I'm sure as I'm standing here

8    would have gone to trial.  He almost tried to go to trial at

9    the -- at the time of his sentencing.  He absolutely would

10   have gone to trial except his own brother spent months

11   avoiding that trial.  And we always thought that was worth 3

12   or 4 points all by itself.  And apparently, the government's

13   not willing to give him anything for that, Your Honor.  And

14   that's ungrateful, and that's not right.

15         There's also Amjad Ayeh who's his relative, too.

16   Amjad Ayeh was on the fence.  He was going back, he was going

17   forward.  Mr. Mohammed said, go forth, plead guilty.  It's

18   best for you, it's best for everyone.  And he did plead

19   guilty.  True that was in Amjad's Ayeh's best interest.  But

20   who helped him to see that that was his best interest?  Who

21   helped induced him to plead guilty?  My client.  And then as

22   I'm sure the Court recalls, both Mr. Abdallah Ayyeh and Amjad

23   Ayeh only came in at the time that my client did.  And that's

24   a huge inducement, too, Your Honor.

25         And then there's Adnan Isa.  And the reality is the

UNITED STATES DISTRICT COURT

1    two of them were on the floor, they spent a lot of time

2    talking about their cases.  These fellows talk about their

3    cases and don't mention it to their lawyers.  It's just what

4    they do.  I mean, they're in there all day long on the same

5    floor in the same case.  And my client stressed and stressed

6    to Mr. Adnan Isa that he really ought to plead guilty.  And

7    my recollection is that all the months he had, I think it was

8    about 2 years, and with all the things that Adnan Isa's

9    brothers did, when does Adnan in?  After my client decides to

10   plead guilty and after my client talks to him.

11          And then there is the thing -- all I'm trying to

12   say about Alasoud, Your Honor, is that my client said, you

13   know, this is that Khalil.  He really could break that case

14   for you.  Focus on him.  If Alasoud wants to go to trial,

15   focus on Izaak Khalil.  It's a minor thing, but it's

16   something my client was also trying to do in that regard.

17          And then on top of that, there's this Ahmad Jaris.

18   Now, Ahmad Jaris as I understand it was not somebody that my

19   client had a lot of direct knowledge about, but they were

20   also in jail together.  They were also talking about the

21   case.  And I got a very nice call last Monday or Tuesday from

22   Ahmad Jaris' attorney who told me, hey, you know what?

23   Mr. Stern called up and wanted me to find out what was the

24   impact on Ahmad Jaris.  I went and spoke to my client, Mr.

25   Jaris, and lo and behold, what you're saying was right.  Mr.

1   Mohammed did have a major impact on persuading Jaris to plead

2   guilty.

3           So the only other thing I'd like to mention about

4   the 5K1, Your Honor, and all the sessions that we had and all

5   the things that we did, and I don't know if this is the right

6   time, Your Honor, but the so-called why was it 2 years?  And

7   I'm really happy to address that.  Should I do it right now?

8           THE COURT:  Sure.

9           MR. KATZ:  Your Honor, different attorneys see

10  their jobs differently.  And Mr. Stern will always see his

11  job a certain way, and I'll see mine a certain way.  And you

12  have in some sense a little bit of a clash of cultures right

13  here, and if we had another case together, we'd probably have

14  the same clash again.

15          THE COURT:  I have no doubt.

16          MR. KATZ:  I don't want to see my client get caught

17  up in the middle of it or end up with so many fewer

18  5K1 points because of it, Your Honor.

19          I tried one of these cases.  I thought it was in

20  front of Judge Timalin.  It was one of the finest prosecutors

21  in the U.S. Attorney's Office and ability who was up against

22  me.  And the jury was out.  I thought I was really in the

23  hunt, Your Honor.  I had an expert.

24          And this is a difficult issue in pseudoephedrine

25  cases if you focus it right with an expert to make the

1    government prove beyond a reasonable doubt that knowledge.

2    When you have thousands of tapes Your Honor that your client

3    is on, it's an opportunity as well as a potential disaster

4    because if an informant comes forth -- and Mr. Stern says we

5    had lots of informants, so you're an idiot, Mr. Katz, or foot

6    dragger to sit around and not recommend that your client

7    plead guilty earlier.

8         But if you have an informant who's on 50 tapes

9    taking about picking up boxes and making deliveries and

10   getting money, and he never talks about what it's going to be

11   used for, that's something you need to know.  Because if you

12   got 50 conversations, and the guy then sits up there and

13   says, lo and behold, the one time it wasn't recorded, yeah,

14   that's the time we talked about, right, you take the 50, and

15   you impeach him.  Okay.

16        And the thing that strikes me given what the

17   government is arguing here is that they never came forward at

18   the beginning of the case which is something I used to do

19   when I was an AUSA and say, look, here it is, friend.  Here's

20   the top hits.  Here's like Dave Letterman's top 10.  Beat

21   these ten things, okay?  We got this, we got that.

22        The best tape we ever found in this case, the best

23   tape for the government was not one the government told us

24   about.  It was this one about peppers or tomatoes or

25   something.  And since there were two kinds of peppers or

1    tomatoes that were cooked differently, and since when

2    pseudoephedrine is made into meth, it's cooked in different

3    processes --

4              THE COURT:  I understand.

5              MR. KATZ:  That was a devastating tape for us.  I

6    said Mr. Mohammed, we cannot go to trial in view of this

7    tape.  And that took a long time.

8              Now why?  Why did it take 2 years to go through the

9    tapes?  This case was built right or wrong on Mr. Mohammed's

10   phone.  It wasn't built on Mr. Shabib's phone, could have

11   been, or Mr. Hamayel's phone, but it wasn't.  It was built on

12   his phone, large amounts on his phone.  And so there were

13   these hundreds if not thousands of phone calls in Arabic

14   which I don't speak a word of, Your Honor.  And so I needed

15   Mr. Mohammed to be basically my translator, my explainer and

16   you name it.

17             They were two huge problems that happened.  One was

18   his availability.  One was mine.  It just so happened to be a

19   very bad time, and I explained that in my reply.  I was in a

20   trial in federal court for 4-and-a-half months.  I was in

21   Nebraska.  I was someplace else.  I had a huge amount of

22   trials and a huge amount of work.  I just did.  I don't want

23   to say it was down to his detriment, but I just did.

24             The other problems, Your Honor, and I've gone

25   through them already, they're not made up or concocted, he

1    was in Las Vegas for a month.  I had no access to him.  I

2    never visited him or spoke to him.  He then got sent out to

3    Kern County which was a huge problem.  And the Court, thank

4    you, resolved it and brought these fellows back.  And all

5    these defense attorneys were complaining that they couldn't

6    make any progress, they couldn't go out, there couldn't do

7    anything.  He was out there, what, a couple of months?

8              Later on he was to be sent to San Bernardino, and

9    the Court had to intervene again and bring him back.  He also

10   got wrongly put in solitary confinement.  That's yet another

11   month.  And you can't work effective when your client's in

12   solitary confinement with the materials.  He laboriously made

13   notes, Your Honor.

14             Just like he tried to help the government in these

15   other cases, he laboriously made notes.  They either lost or

16   discarded his notes at the MDC.  I'm not blaming Mr. Stern

17   for that, but it was a huge problem in our preparation.  Who

18   can forget the -- getting the software in the MDC computer to

19   work litigation?

20             THE COURT:  Oh, I couldn't.

21             MR. KATZ:  They wouldn't play.  And that's why I

22   know to a certainty, Your Honor, that any defense attorney

23   who says that they played the tapes with their client at the

24   MDC cannot be getting it right because they wouldn't play.

25   And then finally, after Your Honor issued the show cause,

UNITED STATES DISTRICT COURT

they sent a tech down to put the right kind of software in,
and that's when they began to play.

And then there was this problem, and it goes to how
much 5K1s he ought to get, Your Honor, and it also going to
the timing thing.  He could not plead guilty even once we
found the peppers and tomatoes tape unless his brother did.
And here's the reality of that.  Mr. Stern knew that Abdallah
Ayyeh was going to go to trial.  Obviously, his main focus
once he had a plea from Mr. Khalil Mohammed would be, okay,
you came along like the calvary because I need you against
your brother.  Tell me about all your brother's crimes.  We
couldn't get into that situation.  And so therefore, as a
practical matter, his brother had to plead guilty along with
him.

And his brother was balking and balking and
balking, and finally, he got him around.  He came in, he
pleaded guilty, and it was certainly in his brother's best
interest.  He caused that, but it delayed him.  He shouldn't
be -- he shouldn't be harmed, Your Honor, with this 5K1 over
this supposed running of time because of what he did that
helped everybody, the Court, Mr. Stern and most of all,
here's the irony, his brother.  Had his brother gone to
trial, I believe his brother would have been found guilty,
and his brother would be serving a lot more time than the 70
months.

1          Okay.  Another thing I wanted to, Your Honor, was

2     also regarding forfeiture.  And that was important thing that

3     Mr. Mohammed did, and I want the Court just to have a very

4     brief sense of that.  Mr. Abdallah Ayyeh had a bunch of cars,

5     a couple of cars and a bank account seized.  This wasn't

6     money in a pillow.  This was cars, titled, registered

7     properly.  This was, you know, money that was in a bank

8     account and had been for a long time.

9          THE COURT:  I think he raised this at the time of

10    his sentencing.

11         MR. KATZ:  Oh.  Okay.  I missed a lot of the

12    sentencing, Your Honor, because of the time change so I'm

13    sorry if I'm repeating something, but here's why it's

14    important for this.

15         Mr. Abdallah Ayyeh brought a forfeiture action, and

16    the family wanted me because I would know then know the whole

17    case to represent Mr. Mohammed who was in jail on his

18    criminal case and to represent Mr. Ayyeh on the forfeiture

19    case.  Okay?  And I think the government raised some conflict

20    issue, but either they didn't raise it about that or it was

21    overruled with regard to that.  In any event, there was no

22    problem with it.

23         As we got down toward the actual trial date,

24    suddenly Mr. Stern runs in front of Judge Klausner and says,

25    oh, my goodness or has the AUSA there run in front of Judge

UNITED STATES DISTRICT COURT

1    Klausner with a declaration from him, oh, my goodness,

2    there's this conflict.  Judge Klausner heard the whole thing,

3    he heard from both clients, and he said, I don't see any

4    conflict whatsoever, let's move forward.

5         At that point, we had an offer on the table,

6    Your Honor, and my client was told, Mr. Mohammed was told by

7    Mr. Stern, it's very important you tell the truth.  Don't

8    stretch things to try to help your bother in the forfeiture

9    case.  And he told that to Mr. Ayyeh's attorney, and he told

10   that to me, and I think he told that to Mr. Mohammed to his

11   face.

12        And you know what?  Mr. Mohammed never did.  He

13   said he was willing to take a lie detector test if he had to.

14   He knew some stuff that helped his brother.  No, he couldn't

15   help his brother win the case totally, but he knew some stuff

16   that helped.  He was completely honest with the government.

17   I mean, think of the pressure that he was under, but he was

18   totally honest.  He was totally rehabilitated.  His brother

19   started to see that there were more important things in life

20   than whether he got a few dollars less or not.  And he came

21   around to a settlement, and the case was settled.

22        And I put the credit for that mainly on Mr.

23   Mohammed who told his brother, look, let's go forward with

24   our life, we both have families, we can make money in the

25   future.  Let's not get into a trial situation and people are

```
 1    testifying, and the government has a problem with that.
 2    Let's just resolve the case, and everybody tell the truth and
 3    resolve the case.  And so I give him credit for that, too.
 4    And it's really an extraordinary amount of cooperation, and
 5    it's worth more than 5 points, Your Honor.
 6             Would you like to hear from the argument, and then
 7    I'll make my Booker argument?
 8             MR. KATZ:  Okay.
 9             THE COURT:  Fine.  And I think probably pick up
10    whatever point you want to pick up, and then maybe you should
11    go to your Booker argument now because then Mr. Stern can
12    address everything at once.
13             MR. KATZ:  Okay.  That would be fine.
14             THE COURT:  Okay, we're ready.
15             MR. KATZ:  Okay.  Your Honor, I just neglected to
16    mention two things with regard to the cooperation, one was
17    Mohammad Azut.  Mr. Azut, A-z-u-t, was a fellow with a
18    violent representation known as someone who would retaliate
19    against witnesses.  Even so my client and Mr. Sanam were
20    willing to testify against him.  And we had a meeting with
21    Mr. Brunwin which was after one of the meetings about Musitef
22    and Mohammad Hammad and so forth that we had with Mr. Stern.
23             And my client told Mr. Brunwin in my presence that
24    he would shoulder the risk, and that he would testify against
25    Mr. Azut who was about to go to trial out in federal court in
```

UNITED STATES DISTRICT COURT

1    Riverside.  They called Mr. Sanam to the stand as I

2    understand it.  And then Mr. Brunwin said, you know, thank

3    you, we appreciate it, but we just think we have enough.  And

4    he apparently had a correct assessment because I think

5    everyone was convicted there.

6            The last thing, Your Honor -- and this is not going

7    to be on the record where someone else could get it, is it,

8    Your Honor?

9            Your Honor, my client had a great deal of

10   information and made this clear at the time that he was

11   talking about Mohammad Hammad and about Musitef and all that,

12   that he knows about people, he's heard through the grapevine

13   or through his family about people who are still engaged in

14   this business.  And some of them are major players of

15   yesteryear who've never been prosecuted and who obviously are

16   undeterred.  And if one cares deeply about this problem as

17   the government says it does, this would be an area that one

18   would expect them to really rally around.

19           And this would be Mr. Amir Hammad who's sort of a

20   legendary kind of guy who's like the fellow who jumped out of

21   a plane in Oregon, committed this big crime and got away with

22   it.  And my client had information about him which is not a

23   happy place for him or his family to be in.  But he did, and

24   he told the government that and also some of the major

25   associates, Mr. Almeeke, and so forth of Amir Hammad, and my

1    client's really got no credit for it whatsoever.

2             THE COURT:  Well, you know, there's a difference

3    obviously between the cooperation you've given and the

4    cooperation that you've volunteered to give it seems to me

5    for purposes of fashioning a 5K1.  And I recognize that there

6    may have been a lot of other cooperation that Mr. Mohammed

7    would have given if the government had called upon it, but I

8    don't think the government has to.

9             What I'm most concerned with and I think you've

10   covered it is the cooperation he's given, and that your

11   position is he's not receiving adequate credit for the

12   cooperation that he's actually given.

13            MR. KATZ:  I feel that very strongly, Your Honor,

14   and I think the Court's heard what I had to say.

15            THE COURT:  Yes.

16            MR. KATZ:  But one of the things for a 5K1

17   consideration is danger to his family.

18            THE COURT:  Yes.  Of course.

19            MR. KATZ:  And I think it's of record, I don't

20   think there's any dispute from the government, that his

21   family has been threatened.  His wife has been threatened.

22   Raja who's here in court has received threatening calls.

23   Mr. Ayyeh's father visited the MDC and told Amjad that he and

24   Mr. Mohammed were under threats from people back home in

25   Jordan because they were informants.

1        And as recently as Thursday when the government

2   filed its opposition under seal, they emphasized that point

3   again, of the fear of retaliation if those pleadings weren't

4   filed under seal, and, of course, I have very much endorsed

5   that and filed my pleadings under seal as well.

6        And then also, Your Honor, the so-called timeliness

7   of the defendant's assistance is one of those factors which

8   is why I dwell on it.

9        THE COURT:  No, I understand that.

10       MR. KATZ:  Again, Your Honor, I think it's very

11   timely if for no other reason than he was able to do so much.

12   To avoid three separate trials, there's no doubt about it,

13   his brother, Musitef and Mohammad Hammad and helped really

14   avoid two or three other trials.

15       Your Honor, turning to the -- the first thing I

16   want to touch on briefly is we do have one request for a

17   downward departure.  We only have one request for a downward

18   departure.  Under the plea agreement, we agreed to only make

19   this one request for downward departure so I don't want the

20   Court to think anything that's raised under Booker quite

21   properly is downward departure.  The downward departure would

22   be his extraordinary family obligations.

23       And I know the Court has been around this issue

24   probably before this case certainly with regard to Mufid Isa.

25   Now, my understanding is that Mufid Isa had his case or the

```
 1    government appealed or something, and the case was remanded I
 2    believe.  So the Court could more specifically --
 3              THE COURT:  I did, and they then affirmed that
 4    ground.  Now, the --
 5              MR. KATZ:  They did?  Okay.  I didn't know that had
 6    happened so thank you, Your Honor.
 7              THE COURT:  That did happen.  But the fact of the
 8    matter is that aside -- or at least I believe they had.
 9    That's my recollection.
10              MR. STERN:  I think what happened was that there
11    was an interim period of time when Booker was being decided,
12    and I believe that the government withdraw its request to
13    have it revisited by the Court of Appeals because the
14    standards changed.
15              THE COURT:  Okay.  That may well have been what
16    happened.
17              Be that as it may, I understand the extraordinary
18    family obligations argument.  I will point out in that case,
19    I think Mr. Isa still ended up with a sentence in the range
20    of 90 plus months.
21              MR. STERN:  108 months.
22              THE COURT:  108.  That was my recollection.
23              MR. KATZ:  Mufid Isa refused to testify.  My client
24    is the difference between night and day, between Mufid Isa --
25              THE COURT:  Oh, I'm not suggesting that he
```

UNITED STATES DISTRICT COURT

1    cooperated.  I understand the difference.

2          MR. KATZ:  Yeah.  My client is much more like

3    Hamayel, Khahallah, Shabib who got 46 months.  He really is,

4    Your Honor.

5          You see, I'm at a bit of a disadvantage, and I

6    don't want to make -- I hope this issue becomes moot.  Okay?

7    And I understand the Court's concern in sealing pleadings and

8    sealing hearings.  And I think the Court probably heard

9    through the clerk or something that I tried to attend a

10   couple of them, and I wasn't able to, and I thought about

11   raising the issue.  And then I said to myself, you know what?

12   I want Mr. Khalil Mohammed's sentencing to be sealed.  So it

13   would not -- it would be hypocritical of me to make an issue

14   of that, and so I didn't, Your Honor.

15         But there is one problem for the lawyer who comes

16   next, and that is it is a bit difficult to say, oh, well, I

17   don't think Hamayel cooperated that much or Shabib or so

18   forth.  Now, I know Shabib lured some friends of his in a

19   minor player, and he ended up being arrested or something

20   when he showed up with what was supposed to be like walking

21   around money.

22         Your Honor, my client avoided three trials of three

23   separate people --

24         THE COURT:  No, you've said that, and I have that

25   written down.  I understand, Mr. Katz.

UNITED STATES DISTRICT COURT

1          MR. KATZ:  Your Honor, just -- and I'll spend

2     1 minute on the extraordinary family circumstances.  And, you

3     know, my wife sees this, and the first thing she says is,

4     what do you mean he two families?  What do you mean he has

5     two wives?  Your Honor, he does, and he supported them.  And

6     thank goodness.  And they love him, and they love the

7     children, and they've these burdens through over 3-and-a-half

8     years of his incarceration, and they're here now, the two

9     families.

10         And I can't possibly know what Isa's situation is

11    or some of the others, but I cannot believe, Your Honor, that

12    anyone has the extraordinary family obligations that my

13    client does.  He's got 12 or 13 dependents.  There are two

14    women, one of whom was about to move into a shelter before

15    she had to move into a relative's house for a while.  Then

16    the kids were out of school.  The kids were doing great in

17    school.  Then a lot of 'em had problems in school.  One or

18    two of 'em has had psychological problems and maybe even more

19    than that.

20         And Your Honor, all of that could abate.  All of

21    that could stop, and it should stop, Your Honor, because he's

22    served enough time.

23         Now, the Court will notice that what I asked for

24    does not yield his release immediately.  There'd be a period

25    in a halfway house.  If Your Honor gives his 57 months, he's

1    got about 4 or 5 months to do in a halfway house.  I think

2    that's appropriate.  It would combine the two things.  It

3    would be some more punishment.  It would be an structured

4    reentry into society and into normal life, but it would be an

5    opportunity to work during the day and support his family.

6         He's a capable person, Your Honor.  He's made a

7    good living before anything having to do with boxes or cases

8    or pseudoephedrine.  He's made money at gas stations.  He

9    tried to do this water business that he's very interested in

10   trying to bring, you know, water, sparkling -- I don't know,

11   sparkling water or natural, you know, like Evian, whatever,

12   that kind of water in.

13        THE COURT:  Right, I understand.

14        MR. KATZ:  Your Honor, okay, so that I think covers

15   the extraordinary family circumstances.

16        Your Honor, let me just touch on the Booker because

17   for the Booker, first of all, you consider the nature and

18   circumstances of the offense.  Now, don't throw a book at me,

19   but Your Honor, I'm replying on an Assistant U.S. Attorney

20   named Mr. Powers.  I've met him.  He is a very cynical, sharp

21   prosecutor.  And he recognized because it should be

22   recognized that these are not cocaine and heroin cases.  Yes,

23   they do harm to society.  I'm not saying that they don't.

24   But what he said was --

25        THE COURT:  I think they're pretty serious.

UNITED STATES DISTRICT COURT

1    They're --

2            MR. KATZ:  And I agree with you, Your Honor.  I

3    agree with you, and that's why the sentences start out high,

4    and that' why you have to cooperate and have unusual Booker

5    factors --

6            THE COURT:  That's exactly right.

7            MR. KATZ -- to have them lower.  But Your Honor,

8    this is not me saying this.  This is the Assistant U.S.

9    Attorney in the Northern District in a related case.  Most of

10   these gentlemen stumbled into the situation thinking what

11   they were doing really wasn't that big of a deal.  After all,

12   pseudoephedrine's a cold medicine.  You can go to buy it at a

13   Walgreen's and take it to clear your nasal passages.

14           The problem is that once these guys figured out

15   what the Mexicans were doing with it, most of the defendants

16   admitted they figured that out -- the figured out that

17   the Mexicans were using it to make some sort of drug.  What

18   sort of drug they probably didn't know, and I believe that.

19           Now, all I'm trying to tell you, Your Honor, is

20   that when you look at the nature and circumstances of the

21   offense, this is not someone who's started dealing marijuana

22   when he was 17, and then he was into cocaine and then into

23   the other.  This thing came along -- and absolutely, once

24   people realized what was going on, they should of gotten out.

25   They should of said, you know what?  I got kids myself.  Are

1   you kidding me?  If that's what this stuff is being used for?

2   Other people's kids?  I get it, Your Honor.

3          But the point is that he did not start out to be a

4   drug dealer.  He kind of got along with these people.  They

5   were doing it.  They were making easy money.  And I can tell,

6   Your Honor, because I fought these cases for clients.  I

7   defended these cases.  The first case I had in federal court,

8   the sentences were 6 months for each defendant in a halfway

9   house.  That was a federal prosecution.  I then had a lot of

10  state cases, Your Honor.  Nobody went to state prison.  Ever.

11  I must have had over a dozen of these cases.  Nobody went to

12  state prison ever.

13         I'm not saying that any of that makes it right.

14  All that I'm saying is that for the nature and circumstances

15  of the offense, when you're talking about does it have to be

16  96 or 90 months, can you give the defendant some break here

17  because of the nature and circumstances of the offense?  It's

18  not cocaine.  It's not the finished methamphetamine.  It's

19  not someone who got into it Day 1 knowing that it was an

20  illegal drug.  It's someone who got into it like so many of

21  them did as was described by the Assistant U.S. Attorney in

22  Chicago.

23         Your Honor, I just did want to touch on a couple of

24  other things, and I want to try to move in a positive way and

25  not get into any kind of snippishness.  And I made it very

UNITED STATES DISTRICT COURT

1    clear that for this thing about how he was hurt by the press

2    stories, that was not at Mr. Stern's doorstep.  I never laid

3    the genesis of that on Mr. Stern's or anyone in this office's

4    doorstep.

5            But the reality is that the DEA was irresponsible,

6    and they were irresponsible in a way that hurt him.  And it

7    should be taken into account because his kids were taunted,

8    and they have been abused on account of that article.  Your

9    daddy has something to do with the terrorists.  People saw

10   those articles.  They appeared as a banner headline in the

11   Riverside newspaper which is in every newsstand and on

12   everybody's desk or whatever at school that the school

13   teacher's looking at in Moreno Valley where all of his kids

14   live.

15           And that's my point about it, Your Honor.  Not in

16   the abstract.  Your Honor put an end to it, and we really

17   appreciated that.  I didn't know where that thing was going.

18   And I was getting flack from people why are you

19   representing -- you're representing terrorists?  What the

20   hell's wrong with you?  So I appreciate that.  But what I'm

21   talking about now is not the abstract.  I'm talking about the

22   specific harm that it did to him and his family which I think

23   makes it a little bit different.  You don't have that in

24   every case, and I think that's a factor that can be taken

25   into account under Booker.

1          Your Honor, in terms of adequate deterrence, you

2    start with the premise that it was okay for huge dealers like

3    Mr. Shabib, Mr. Hamayel, Mr. Khahallah to get 46 months.  If

4    you take the premise that you have to in this case that

5    Nabhan Isa who came in, lied, wasted the government's time,

6    did the exact opposite of what Mr. Khalil Mohammed did which

7    was just help them and help them and then help 'em some more

8    and then think of ways to help them, Nabhan Isa got

9    63 months, I think that's really kind of the framework to

10   think about the deterrence in this case.

11         He never made bail.  Over 3-and-a-half years, he's

12   been away from his family unable to help them, the wife going

13   into a shelter or about to go into a shelter.  You've got all

14   these privations, all that he suffered, and I'm going to talk

15   about that in just one second very briefly, the privations

16   he's suffered in state jail almost having his arm broken or

17   wrist broken or whatever it was, being taunted racially and

18   ethnically in the days after 09-11.

19         Nobody would look at the situation and say, you

20   know what?  I would not be adequately deterred by a 57 or

21   60-month sentence.  It would take a 90-month sentence, what

22   the government's asking for, to adequately deter them given

23   this whole universe of the 46-month sentences, the 63-month

24   sentence for Nabhan Isa.

25         Your Honor, there's no need to protect the public

1    from him or for him to get vocational training because he's a

2    reformed person.  And I hope if anything comes through from

3    the letters and from what he's done for the government, he's

4    in touch with his religion and obeying the tenants of his

5    religion.  He has been in a penitentiary type situation, and

6    he has been penitent, and he has turned his life around.  And

7    he's no danger to the community, and it would be a great help

8    to the community if he could get out and support his family.

9         And Your Honor, the last thing I want to mention is

10   there are those guidelines cases, I'm not asking for them

11   under the guidelines, but they're are those cases where they

12   talk about how much harder the time is when you're in a state

13   jail or you're solitary confinement, and there are cases

14   where they've given like 2 to 1 credit.  I'm not asking for

15   that as an inflexible or rule or anything like that like you

16   see some of the cases.

17        All I'm saying is -- all I'm saying is in thinking

18   about 57 months for him, there's the reality that he did this

19   awful, awful time in state custody where he was really

20   physically abused, mentally abused and also where he was

21   harmed, and all these things have happened.  And so I think

22   when you look at the totality of the circumstances,

23   Your Honor, I think this is really a situation where the

24   Court can feel comfortable.  I just -- I think it's fine.  I

25   think that if he got 57 months, that would be fine.  That

1    would be 11 more months than the other people.

2         And I want to say one last thing, Your Honor.

3    Your Honor made the bail decision, and I'm not rearguing

4    them.  I believe that in complete good faith, he would not

5    have run away, that we could have fashioned the bail, but

6    those are the calls, and we never appealed it.  I was sure

7    the Court would be affirmed on its judgment call in that

8    regard, and we came back to the Court a few times because we

9    thought we had pertinent new facts.

10        But had he gotten bail, here's the reality.  He

11   could get a 70 or 80- month sentence.  He would show up at

12   the institution.  He'd be put into the drug and alcohol

13   program.  And the Court knows he was drinking a lot during

14   this time and certainly had a alcohol problem.  He'd be put

15   into the alcohol program, and he'd have a year shaved off.

16   He's never gonna have that opportunity.  And that's only

17   because he was denied bail in this case.  So I think that --

18        Do you understand what I'm saying, Your Honor?

19        THE COURT:  No, I don't because I -- can't I

20   recommend that program in any event?

21        MR. KATZ:  You can, Your Honor.  But let's assume

22   that he gotten let's take a number, 70 months.  70 months, if

23   he hadn't been out of custody, he'd go into custody, he'd

24   sign up for the program, he'd be put in the program, he'd

25   have time to complete it, and they'd shave 12 months off.

1          THE COURT:  I understand that.

2          MR. KATZ:  The reality now is he won't get the

3   12 months shaved off.  Now, of course, the Court could give

4   him something like 90 months, and then, yeah, maybe he'd have

5   the 12 months shaved off.

6          THE COURT:  That's the question I'm asking.

7          MR. KATZ:  But that's too high, Your Honor.

8          THE COURT:  Well, I know you say --

9          MR. KATZ:  It's just too high.

10          THE COURT:  -- it's too high, but I may disagree

11   with you.  I don't know where I'm going to come out on this,

12   but all I'm saying is there certainly is some scenario and

13   some sentence where he would be eligible for that program.

14   And so I'm just -- I just wasn't following you, Mr. Katz, but

15   now I understand.

16          MR. KATZ:  I can just say this, Your Honor.  From

17   the bottom of my heart, and I know we're not here to vouch,

18   we're here to present legal arguments, 5 points is too few

19   for what he did.  I was there, I saw it, I know the result of

20   it.  And if the idea is to affect future conduct, the idea is

21   to affect future conduct, this is way too small a break for

22   the amount that he did and the amount that he risked.  Thank

23   you, Your Honor.

24          THE COURT:  All right.  Thank you.

25          Okay, Mr. Stern.

1        MR. STERN:  Let me start initially by saying the

2    defendant once he decided to plead was very helpful.  As

3    Mr. Katz has pointed out, he provided a lot of information

4    about Tony Musitef.  He provided a lot of information about

5    Mohammad Abdallah Hammad.  We don't question that.  He is

6    very bright.  He was very forthcoming.  He directed us to

7    tapes.  He translated tapes.  He did all the things that he

8    is asserting that he did in that regard, and that's why we're

9    recommending 5 levels off.

10        Now, let me say this.  I believe that Mr. Katz has

11   exaggerated other qualities or other aspects of the asserted

12   cooperation by the defendant, and I think that his analysis

13   is wrong in determining the recommendation that he's made for

14   you.  So let me talk about some of that.

15        One of the things that Mr. Katz has indicated is

16   that the government essentially gave the other defendants

17   more points off by not attributing to them and not

18   negotiating a 2-point enhancement for being a supervisor or

19   leader.  And I can tell the Court that we sat down when we

20   began to go through this and tried to figure out who we could

21   think of that these people were organizing or leading.  And

22   it became very evident to us in our discussions based on the

23   review of the evidence that Khalil Mohammed was the person

24   that organized and leaded and managed the most number of

25   people.

1          For instance, defense counsel talked about Nidal

2     Hamayel.  There's no question that Nidal Hamayel was heavily

3     involved in pseudoephedrine trafficking.  He admitted as

4     much, we have proof as much.  But when we tried to figure out

5     who he was directing, who was working under him, we couldn't

6     figure anyone out in that regard.  We know that people buying

7     from him because we saw codefendants like Alfonso Pelayo come

8     and buy from him, but all of the tapes and even Alfonso

9     Pelayo's own statement indicated that he wasn't work with

10    Hamayel, but rather he was just buying from him.

11         We know who Nidal Hamayel was buying from because

12    we were able to intercept wire tap conversations which showed

13    that.  But even in speaking with those cooperators, they told

14    us that they were not working with Nidal Hamayel.  So simply

15    because we can show a connection between someone like Nidal

16    Hamayel and other people doesn't mean that they were managing

17    him.  And for that reason, we didn't negotiate and

18    enhancement provisions in relation to them.  So defense

19    counsel's argument that somehow we gave these people

20    under-the-table reductions simply is not accurate and not

21    supported by the record.

22         Now, defense counsel said that I am trying to send

23    a message to the defense bar and that's why I'm only

24    recommending 5 levels as a reduction for the defendant.  The

25    fact of the matter is as this Court knows defendants who come

1  in earlier are much more likely to provide substantial

2  assistance and the nature of their substantial assistance can

3  be much greater because they can create a domino effect and

4  create many more pleas and provide us with the type of

5  assistance that can't get without their cooperation.

6          So when Nidal Hamayel came in as the first

7  defendant, he broke ranks with all the other people who were

8  holding together very tightly had decided not to cooperate

9  with the government.  He identified voices on tapes that we

10  were not able to identify.  He was able to go through many

11  people that we've had a lot of question marks about and

12  provide us with a lot of information that we didn't have.

13  The first 3 or 4 or 5 people were able to do those types of

14  things by virtue of the decision they made come to in early

15  and essentially cut their losses help the government as much

16  as they could.

17          When a defendant like Khalil Mohammed comes in more

18  than 2 years after the fact, much of the information he is

19  providing we already knew by virtue of the fact that the

20  people came before him that decided early on to plead guilty

21  had already given it to us, had already explained to us what

22  was going on in the tapes, had already explained to us the

23  nature and role of the other people, had already allowed us

24  to disclose their briefings which created a domino series of

25  consecutive pleas that we were able to give them credit for.

1          So the fact of the matter is that when defense

2     counsel says that it's AUSA Stern that's trying to stop the

3     defendant from getting more of a reduction because I don't

4     want to do a lot of work and essentially, I'm lazy, and I'm

5     trying to reward those other people who stopped me from

6     having to do the work, that's not accurate.

7          It's the early pleas that always or under most

8     circumstances I should say give us the type of substantial

9     assistance that makes it reasonable for us to come in and say

10    out of 41 defendants, Nidal Hamayel and 3 to 4 defendants

11    after him who came to the government broke ranks with the

12    people that they were both family with and had been working

13    illegally with should get the very substantial type of

14    reduction that distinguishes them from people like Khalil

15    Mohammed who came in 2 years later.  That's why they got the

16    reduction, not because we're trying to send some odd or

17    inappropriate message to the defense bar.

18          All right.  Let's talk about the defendant's

19    cooperation, if we may.  With respect to Tony Musitef, I have

20    to believe that the defendant's cooperation had a lot to do

21    with Musitef's decision to plead guilty.  Defendant provided

22    us with a lot of information about the overarching conspiracy

23    that he was involved with Musitef in because he was the

24    person that had hired Musitef, he was able to explain to us

25    with great nuance and detail what was going on in the

1    transactions that we had actually surveilled because we had

2    picked them up on the wire tap.

3            Also, perhaps the most important thing that

4    defendant provided was pointing out to us two wire tap calls

5    that we had not been familiar with.  I'm sure we had

6    identified the calls, but we didn't know the value of the

7    calls and defendant pointed them out to us in which Musitef

8    was talking about getting gallons of milk and asking the

9    defendant for more gallons of milk because he had already

10   sold the ones that he had.

11           What the defendant was able to do was point out to

12   us that Musitef wasn't just working for him as a person

13   selling pseudoephedrine or moving pseudoephedrine or storing

14   it on his behalf, but rather Musitef had his own customers

15   and that was very important to us.  And that is part of the

16   reason that we're recommending a full 5 levels off.  And we

17   were able to utilize that and go to Musitef and his attorney

18   and point this material out to him and I think it had to have

19   some impact on Musitef.

20           Now, to the extent that defense counsel is trying

21   to show a linear connection between the defendant's meeting

22   with Musitef and the guilty plea, that actually is not so.

23   Defendant met and offered to meet with Musitef and we

24   certainly give him credit for that.  He did meet with Musitef

25   and he told Musitef that he was going to testify against him.

1    Essentially, he was going to tell all that he knows.  But it

2    was a long time after that before Musitef decided to plead.

3         In fact, Musitef came to my office about 3 days

4    before the actual trial date when we really thought we were

5    going to trial.  And we sat down with Musitef and his

6    attorney and we went through the videotapes that we had

7    actually put together on compact disk that we were able to

8    show him the snippets of and we played for him the telephone

9    calls.  And we certainly told him that the defendant was

10   going to be testifying against him.

11        But I think that what happened was when he saw all

12   of this presented to him in the form that we were going to be

13   presenting it at trial, it was actually in the office that he

14   and his attorney Mike Treman talked.  And then said we

15   believe that you have a case that you're going to be able to

16   succeed on.  We're going to plead guilty.  If the Court

17   remembers, it was the very same day that we were meeting with

18   Musitef that we then called the Court and asked for an

19   accommodation and the Court did accommodate us and we came

20   down and defendant Tony Musitef pled guilty.

21        So undoubtedly, I think that the defendant had

22   something to do with the assessment that he made about

23   whether or not he was going to plead guilty, but the lineal

24   progression between the defendant talking to Musitef and his

25   guilty plea that defense counsel is trying to ask the Court

1    to memorialize in some type of bronze statue simply is not

2    there.

3            Now, with respect to Mohammad Abdallah Hammad,

4    again, there is no question that defendant was very helpful

5    with Mohammad Abdallah Hammad.  He provided us with the

6    background, I mean the narrative essentially of what happened

7    with him and Hammad.  And because he was supplying Hammad

8    with large, hundreds and hundreds of cases of

9    pseudoephedrine, he was able to tell us about what we already

10   knew, but that's important.  We already knew this because we

11   had agents who were conducting surveillance and we had many,

12   many wire taps that showed the connection between the

13   defendant and Hammad.

14           Now, Hammad's attorney said that he spoke with

15   Hammad and Hammad said it was the wire tap evidence that

16   ultimately convinced him to plead guilty.  And I can tell the

17   Court that before he plead guilty, again like with Mr.

18   Musitef, we brought him into the office, we sat him down, we

19   played him the recordings not only to him and his attorney at

20   the time, but also to an attorney who was handling his

21   immigration who was saying I think you should go to trial

22   until she heard these recordings.  And it was then that

23   Mr. Hammad decided that he may need to plead guilty because

24   the evidence was very strong against him.

25           So I don't dispute, in fact, I absolutely concur

1    the defendant was very helpful with Mr. Hammad.  But again, I

2    don't think there is that lineal progression that defense

3    counsel is trying portray to the Court.  And I think Hammad

4    would have plead guilty regardless of whether or not the

5    defendant was cooperating based on the strength of the wire

6    tap and his understanding of the wire tap.

7           And defense counsel -- as a parenthetical comment,

8    I should say this.  Defense counsel said I don't understand

9    why the government wasn't talking immediately to Khalil

10   Mohammed about Mohammad Abdallah Hammad.  The government

11   essentially he is implying was negligent in not talking to

12   him immediately about Mr. Hammad, and there's a reason that

13   we didn't do that.

14          Number 1, we had more than enough evidence to

15   indict Mr. Hammad and Number 2, we were very concerned about

16   the conflict of interest that existed because Mr. Katz had

17   actually represented Mr. Hammad in a pseudoephedrine case in

18   state court, and we were also receiving information that

19   Mr. Katz was having ongoing contact with Mr. Hammad.

20          So our concern was if we sat down and began asking

21   him and his client about Mr. Hammad, it was going to be

22   evident that we were eminently going to indict Mr. Hammad and

23   that would get back to Mr. Hammad who would then flee and we

24   would not be able to arrest him like Raof Isa or Mohammad

25   Michel or other people we have a fugitives in this case.  And

1    that is why we were concerned about discussing this with the

2    defendant early on.  Once we indicted Mr. Hammad and he was

3    in custody, we then immediately contacted the defendant and

4    asked him for information and he provided the information

5    without hesitation.

6          Now, defense counsel says that the defendant

7    precipitated the plea with his brother Abdallah Ayyeh.  And I

8    don't doubt that the defendant's decision to plead guilty had

9    something to do with Abdallah Ayyeh's decision to plead

10   guilty.  And frankly, also Amjad Ayeh his nephew's decision

11   to plead guilty.

12         But the fact of the matter is what happened was the

13   three of them got together and we know this because we've

14   talked to them and we talked to them in front of the other

15   defendants at times.  The three of them got together and had

16   made the decision that they were all going to plead guilty

17   and all obtain the benefit.  And they knew of course they if

18   they did that, they would each get credit for essentially

19   creating a package set of pleas.

20         If I remember correctly, and I didn't look at it

21   before I came to court, but Abdallah Ayyeh I think said that

22   he was also in part responsible for Khalil Mohammed's plea.

23   But the fact of the matter is that they made the joint

24   decision to plead guilty.  And again, I don't think that

25   there's the lineal direction and the lineal push that defense

```
1    counsel claims.  I do believe that it was clear that if they

2    all plead together as a group, then they felt they could

3    plea, get the benefit of cooperation, and essentially not to

4    have hurt each other because they would have all pled.

5              Let me say this, though, that it is our position

6    that the defendant was not truthful when he sat down with us

7    and provided us with information about his brother that

8    essentially he did the same thing that Nabhan Isa did which

9    is minimize dramatically the role that his brother played.  I

10   understand why defendants do that.  I'm not disputing that.

11             But I think the Court should know that the

12   defendant did not sit down and tell us those very things that

13   we presented to the Court when were explaining to the Court

14   what the evidence actually showed Abdallah Ayyeh's

15   involvement was in this case.  So to the extent that defense

16   counsel is trying to compare his client to Nabhan Isa, both

17   of them lied to us we believe in essentially the same way in

18   trying protect their brothers from future culpability.

19             With respect to defense counsel's initial statement

20   about the effect that the defendant had on Mohammad Alasoud's

21   decision to plead guilty and now his revised statement, I can

22   say clearly that the statement that he asserted to the Court

23   in his motion papers is simply not true because we contacted

24   defense counsel Glen Jonas who was the attorney for Mohammad

25   Alasoud who said Khalil Mohammed had absolutely nothing to do
```

1    with Alasoud's plea.  There was no contact with him in the

2    spring or summer of 2004.  The conversation that Mr. Katz is

3    referring to simply never occurred.

4          So the problem that exists is that essentially the

5    defense counsel is going through virtually every plea and

6    trying to figure out if there is any way for him to say that

7    Khalil Mohammed had something to do with the plea and then

8    simply asserting it whether or not it's true as has been

9    proven by the fact that Alasoud and Khalil Mohammed were

10   never together after that one day when they crossed paths in

11   the Riverside jail.

12         Now, again, we don't dispute the effect he had on

13   Hammad and the effect that he undoubtedly had on Musitef, but

14   I think it's not accurate to try and extend that out to say

15   that he made Adnan Isa plead guilty and he made Ahmad Jaris

16   plead guilty.

17         For instance, Adnan Isa plead guilty, and I think

18   he told the Court this when he pled guilty in an attempt to

19   help out his brothers and justifiably so because Nabhan Isa

20   dimed out his brother.  Initially, he tried to minimize his

21   role, but ultimately he told us what Adnan Isa was involved

22   in and we a slew of wire tap tapes with Adnan Isa talking

23   about what was going on.  There was no indication during the

24   course of Adnan Isa's own sentencing hearing that it was

25   Khalil Mohammed that made him plead guilty and that's simply

1     not true.

2            With respect to Ahmad Jaris, defense counsel is

3     right I did ask Ahamd Jaris' attorney to go back to him and

4     ask him what type of pressure, if any, Khalil Mohammed had in

5     his decision making process to plead guilty.  And the defense

6     attorney left me a message and then I've spoke with her and

7     she said Khalil Mohammed was very helpful to the defendant.

8            But the essence of what she told me was not that

9     Khalil Mohammed prompted Ahmad Jaris to plead guilty, but

10    that Ahmad Jaris was dissatisfied with his counsel at the

11    time so he would ask Khalil Mohammed legal questions, would

12    then go to Mr. Katz get the answers to the legal questions

13    and pass them back to Ahmad Jaris.

14           These are vastly different things than encouraging

15    someone to plead guilty.  And frankly, I have a bit of a

16    concern that essentially Mr. Katz through his client was

17    communicating with someone else's client, Ahmad Jaris, when,

18    in fact, he should not have been passing on that type of

19    legal information.

20           With respect to the 2-year delay, I think we should

21    talk about that because defense counsel wants to convince the

22    Court that there is essentially no difference between a

23    defendant who challenges the government's case for 2 years,

24    asserts consistently that he's not guilty of the charged

25    offense, tells the government that he's going to go to trial,

1   demands that the government prepare for trial for a period of

2   2 years, and then shortly before his trial ultimately decides

3   to plead guilty versus someone who comes in 3 or 4 weeks

4   after being charged with the very same offense, tells the

5   government all along I'm guilty, you've got me, you've got

6   the evidence on me, I want to do whatever I can to cooperate,

7   let me identify voices on tapes, let me tell you a narrative

8   about what was going on, let me fill in the blanks that you

9   don't know about that I do know about, let me you allow you

10   to disclose all of my cooperation so that other people can

11   see that I'm cooperating against them.  There is a difference

12   of vast magnitude.

13         And it's not that the government is lazy and is

14   unwilling to prosecute the defendant for the last 2 years.

15   The defendant has an absolute right to contest the charges

16   against him.  He has an absolute right to go to trial if

17   wants, but he should recognize that if he contests the

18   charges against him for 2 years and takes himself out of the

19   running to provide very important information that he may

20   have for 2 years that in the end when he finally comes to the

21   government, he's not in the same situation to present the

22   type of cooperation, the type of substantial assistance that

23   got these defendants who got very large recommendations for

24   reduced sentences the type of recommendations that they

25   received.

1          And frankly, as I've said before and I'll say it

2    again, to equate someone who pleads 2 years after the fact on

3    the eve of trial or a few weeks before trial or a month

4    before trial with those people who came in 3 weeks after they

5    were indicted is essentially to trivialize people who made

6    the very difficult decision to break ranks with their family,

7    with their friends, with their cohorts and help the

8    government out very early on.  And that's something the Court

9    should not do.

10          With respect to defense counsel's assertion that

11   somehow he was incapable of pleading his client for the

12   2 years that it took for him to plead his client or for the 2

13   years it took for his client to plead guilty, again, that's

14   not true.  As I pointed out in my brief, you don't need to

15   listen to the 75th or 80th or 90th or 100th tape to recognize

16   that the government has a strong case against your client.

17   It wasn't necessary for Mr. Katz to listen to all 1500 or

18   2,000 tapes to make the determination that we had good wire

19   tap evidence.

20          And defense attorneys make these assessments all

21   the time.  And what Mr. Katz is doing is strategically trying

22   to come up with an excuse to explain away the fact that his

23   client took more than 2 years to plead guilty and make the

24   burden rest on his shoulders and say, Judge, I couldn't have

25   plead my client until I listened to every single wire tap

1   recording and looked at the many, many interview statements

2   that were ongoing for every single witness.  And the Court

3   knows pragmatically that just is not the truth.

4          And even if Mr. Katz is willing to shoulder the

5   blame in an attempt to help his client out, the fact doesn't

6   change that the defendant and Mr. Katz knew all along the

7   nature of the case against them.  And if he had wanted to

8   plead, he could have plead.  If he had made the decision

9   rather than challenging the government's case as he's

10  entitled to do, to come in early, we would be here under

11  different circumstances.

12         With respect to the software concern, I don't know

13  how in the end the Court perceived this, but it became

14  evident I believe that there was no problem with the

15  defendant's listening to the tape-recordings.  All of the

16  other defendants did that.  In fact, most of them had little,

17  mini CD players.

18         THE COURT:  I don't think you have to argue that.

19  I mean, I understand.  I realize, and it's not an affront to

20  Mr. Katz, obviously there were some things incorrect in the

21  way that he was operating the equipment or in his specific

22  tapes, there was a problem.  But I'm not going to buy into

23  his view that no other defense lawyer listened to things, and

24  I know what we went through to make it possible for him to

25  listen to them.  And I did that in an effort to get this case

1    ready for trial.  Mr. Katz, once he had the equipment he

2    needed was able to download and review the tapes.  But I just

3    don't think that that's a significant factor that cuts one

4    way or the other in my decision.

5              MR. STERN:  Very good.

6              Mr. Katz talked about the threats that were

7    suffered by the defendant.  If the defendant was abused by

8    his jailers, I'm going to suggest that he contact OPR or

9    contact the head of the Bureau of Prisons or MDC to report

10   the particular abuses, the dates of the abuses, the medical

11   damage that was done during the course of the abuse and the

12   identity of the abusers.  Because if that took place, then

13   the fact of the matter is it shouldn't have taken place, and

14   there should be some type of repercussion for those who did

15   it.

16             The problem is that these vague assertions of

17   threats and abuse by the jailers at MDC and the outlying

18   jails never came in a specific way from defense counsel.  And

19   essentially, what the defendant is trying to do is negotiate

20   his way into the role of the victim, and Mr. Khalil Mohammed

21   is not a victim here.  He's trying to tell the Court through

22   his counsel that he really didn't know that he was involved

23   with illegal substances to begin because they were

24   decongestants, that once he learned this, he should have

25   stopped but really didn't.

1          THE COURT:  I'm really not very persuaded by that

2    argument.  I don't think you have to address it.

3    Mr. Mohammed was involved in the distribution of many cases

4    of pseudoephedrine and has many people reporting to him, and

5    it was obviously lucrative.  And I don't buy into the view

6    that he somehow didn't know what he was doing or that it was

7    serious.

8          MR. STERN:  And let me say this.  That is so

9    clearly disputed by the fact that in February of 2001, the

10   defendant had the thousand cases of pseudoephedrine that he

11   was bringing in that were seized.  There were all sorts of

12   calls the defendant was making to police, you know,

13   threatening people to determine whether or not they had

14   actually been seized.

15          There could have been no doubt in anyone's mind

16   with the smallest modicum of intelligence what he doing, let

17   alone the defendant who is obviously a very bright man, but

18   it didn't stop him from a couple of months later in April of

19   2001 to bring in another thousand cases of pseudoephedrine

20   which would have made hundreds and hundreds and hundreds of

21   pounds of methamphetamine.

22          And to the extent that defense counsel seems to be

23   trying to convince the Court that heroin is a bad drug,

24   cocaine is a bad drug, but methamphetamine is really not so

25   bad, that absolutely is not true.  This Court heard testimony

UNITED STATES DISTRICT COURT

1    about horribly damaging effects of methamphetamine on people

2    who utilize it.

3         THE COURT:  I see supervised releasees in here all

4    the time who have meth problems, and it is a serious, serious

5    problem, and it is certainly in my judgment just as serious

6    as cocaine or heroin.  And it seems that once people start

7    using methamphetamine, they have a much more difficult time

8    stopping it so I'm not very persuaded that somehow

9    methamphetamine is a different sort of drug.

10        MR. STERN:  Very well.  Then I won't spend any more

11   time on that.

12        With respect to defense counsel's comparison

13   between this defendant and the other defendants who got

14   particular sentences, let me talk about that for a moment.

15   Defense counsel is right, Nabhan Isa received 63 months, but

16   what defense counsel didn't point out was that even before he

17   was arrested, Nabhan Isa had approached the DEA and

18   cooperated with the DEA.

19        And based on the affidavit that was supplied by

20   defense counsel for Nabhan Isa had actually assisted directly

21   in the seizure of a thousand cases of pseudoephedrine, that's

22   a big deal.  In large part that's why the government made a

23   recommendation and frankly, I think our recommendation was

24   either 70 or 78 months.

25        THE COURT:  It was, and I went down below the

UNITED STATES DISTRICT COURT

1    level.

2            MR. STERN:  That's correct.  But the reason that we

3    were willing to recommend that type of recommendation is

4    because of Nabhan Isa, we were able to take a thousand cases,

5    4,000 pounds of pseudoephedrine off the street and but for

6    his cooperation, the affidavit from the agent in Chicago said

7    we probably would never have actually seized.  That's huge.

8            And that's distinguishable from the type of

9    cooperation that the defendant provided.  I don't want to

10   minimize the type of cooperation the defendant provided

11   because it was helpful.  That's why I'm here asking you to

12   reduce his sentence by 5 levels.  But there needs to be a

13   distinction between someone who allows us to seize 4,000

14   pounds of pseudoephedrine and someone who doesn't.

15           And the other thing is that for all the criticisms

16   that we've had of Nabhan Isa because he minimized his

17   brother's involvement, the defendant is in the same situation

18   exactly because he minimized his brother's involvement.  So

19   to that extent, they're essentially a wash.  And then what

20   you're left with is Nabhan Isa giving us information which

21   led probably at least in part to the guilty plea of several

22   other people including his brothers who were hanging tough in

23   deciding not to plead guilty and also to the seizure of a

24   thousand cases.

25           And perhaps most importantly, Nabhan Isa came in

UNITED STATES DISTRICT COURT

1    very, very early which gave him the opportunity by his own

2    decision to provide a lot of information very early on that

3    we didn't have that allowed us to then turn that information

4    over to other people as I discussed before.  And again, I

5    think we need to make a distinction in the timing when

6    someone comes in and pleads guilty because that dramatically

7    effects the type of cooperation that they can provide, and it

8    did exactly that here.

9         Mufid Isa.  Mufid Isa received 108 months for no

10   cooperation.  Mufid Isa came in much earlier than the

11   defendant.  Adnan Isa did not cooperate and he received

12   120 months.  And, you know, I don't remember the exact time,

13   I think he came in right around the same time as the

14   defendant, but there is a distinction between these people

15   that needs to be made.  And it's not appropriate for defense

16   counsel to say Nabhan Isa got 63 months.  My guy should get

17   the same thing because Nabhan Isa got 63 months.

18        Defense counsel talked about Rahif Sanam.  Rahif

19   Sanam actually was threatened, directly threatened.  We were

20   able to document that.  And the fact of the matter is that

21   Rahif Sanam came in much earlier than the defendant, Number

22   1, Number 2 was a much smaller player than the defendant.

23        In fact, the tapes show that the defendant was

24   selling pseudoephedrine to Rahif Sanam in amounts like

25   40 cases at a time.  In fact, we had the defendant

UNITED STATES DISTRICT COURT

1    negotiation to sell Rahif Sanam 40 cases.  So the purchase of

2    40 cases is vastly different then the thousands of cases that

3    the defendant was involved in.

4           And also, and this cannot be ignored, Rahif Sanam

5    actually took the stand and publically testified against

6    several people in a Riverside trial, and those people had

7    actually pulled a gun and put it to the head of a government

8    informant during the course of an undercover deal.  So to the

9    extent that the Court is trying to figure out whether or not

10   the threat that Rahif Sanam was under or the threat that he

11   perceived he would be under was real and concrete, it's very

12   clear.  These were people that actually almost killed a

13   government informant during the course of an undercover deal,

14   and Rahif Sanam took the stand and publically testified

15   against them.

16          There's something to be said for that, and there's

17   a lot to be said for that which we did say.  We weren't even

18   asking for the 46 months that he got, but the Court I think

19   thought that was so impressive and so above and beyond the

20   type of things people typically do that it gave Rahif Sanam

21   46 months.  But it isn't appropriate to talk about Rahif

22   Sanam's cooperation in the same breath as Khalil Mohammed's

23   cooperation because they're vastly different types of

24   cooperation.

25          With respect to the extraordinary family

1    circumstances, against our objection, this Court downwardly

2    departed for Adnan Isa and for Mufid Isa based on

3    extraordinary family circumstances.  And if I remember

4    correctly, what was driving that decision was the Court's

5    recognition that the government had essentially indicted all

6    of the money earning male workers.

7            THE COURT:  That is exactly right.

8            MR. STERN:  That Mufid Isa was indicted, that Adnan

9    Isa was indicted, that Nabhan Isa was indicted and even Raof

10   Isa was indicted and in custody awaiting extradition in

11   Israel, and I think that that's really what was driving the

12   Court's decision.

13           THE COURT:  I think I made it very clear when I

14   wrote the statement of reasons after the fact, and it was

15   that all of the brothers were facing long terms of

16   incarceration, and that there were children in multiple

17   families being affected.  It's not a situation -- and I don't

18   want to -- obviously, it is Mr. Mohammed's right to have two

19   families, but, I mean, it is of his creation.  It's not the

20   situation that I was confronted with in the Isa case.

21           MR. STERN:  Thank you.  And that's what I think

22   distinguishes the circumstances of the Isa family from the

23   defendant.

24           Now, in wrapping this up, let me say this.  I know,

25   and the Court knows because every defense attorney, every

UNITED STATES DISTRICT COURT

1    suggestion that we have made for downward departure, the

2    defense attorney has come in and said the government is not

3    giving me as much as I should get.

4          THE COURT:  It always happens.

5          MR. STERN:  That's the way of our system.  The

6    defense attorneys want one thing, the prosecution wants

7    something else.  But to the extent that we really are the

8    people who are I think best in the circumstance of trying to

9    compare 41 defendants and create some measure of comity and

10   comparative assessment both in the nature of the offense the

11   defendant was involved in, when they pled guilty and the type

12   of cooperation and how much value they offered to us.  We

13   looked very carefully at Khalil Mohammed's recommendation.

14   And it was the subject of a lot of discussion within my

15   office.

16          And while as I said before, Khalil Mohammed was

17   very forthcoming about certain issues when he decided to come

18   in, he didn't -- he wasn't able to give us the type of

19   cooperation that would have justified a greater

20   recommendation.  If, for instance, he had come in earlier, he

21   would have been able to tell us about Isa Atrash, and he

22   would have been able to tell us about Khaled Ahmad, two

23   people who actually told us about him.

24          But the fact of the matter is that people need to

25   be held responsible for the choices that they made.  And if

1  they decide that they don't want to plead guilty, while it is

2  their right, there needs to be some distinction that's

3  created between them and people like Khaled Ahmad and Isa

4  Atrash.

5         His family members who came in very early on and

6  provided us with a lot of information that in our papers for

7  them which will be forthcoming, we're going to tell the Court

8  probably precipitated in large part his decision to plead

9  guilty or certainly in substantial part precipitated his

10  decision to plead guilty.  And the fact that he decided not

11  to do that needs to distinguish him from those people who

12  did.

13         So when we're trying to come up with an actual

14  recommendation for a sentence, what we did was we looked at

15  what the defendant would get if he received three levels off

16  for acceptance of responsibility and if we agreed and

17  acknowledged that he should get two levels off for the safety

18  valve.  And his calculation under those circumstances are a

19  guideline range of 168 to 210 months.  So when we recommend

20  97 months as a departure from 168 to 210 months, it's a lot

21  of time off.

22         And I know that defense counsel seems to be trying

23  to convince the Court that it's somehow trivial or somehow a

24  speck on a very large wall of recommendations for much higher

25  sentences, but that's almost 6 years as a departure, and we

UNITED STATES DISTRICT COURT

1    think it's reasonable.  And that's what we're asking the

2    Court to do.

3              THE COURT:  All right.

4              Mr. Katz, I know you want to reply.  Let me tell

5    you what I do think at this stage because I don't want you to

6    argue idly.

7              First of all, I have no doubt no matter what you

8    say that Mr. Mohammed was resistant to pleading guilty at the

9    beginning part of the case.  I remember well what went on at

10   MDC, what went on at Kern and the difficulties.  I am firmly

11   convinced that some of the other defendants who cooperated

12   earlier, in fact, had more information to give simply because

13   they came in when the government had less information.  I'm

14   not holding it against your client, but the fact of the

15   matter is in my judgment his cooperation came later and that

16   is in my mind a factor that's going to guide me here.

17             Secondly, I have made the statement I've made about

18   family circumstances.  I have no doubt that Mr. Mohammed once

19   he started cooperating was very helpful.  I also have in mind

20   the fact that he had a significant role in this transaction.

21   I'm not saying the most significant, but certainly a

22   significant role, and that impacts my thinking for purposes

23   of a further downward departure.

24             Because what has happened here with many of the

25   other defendants you have recommended, the government has

1    come in and recommended a 5 or a 6-level downward departure

2    based on the cooperation.  But then based on the relative

3    role of the person in the conspiracy, based upon the factors

4    enumerated in Section 3553, they have said at least in some

5    cases to have a sentence proportional for this defendant in

6    relationship to other sentences I fashioned, we wouldn't

7    object if you went down 3 or 4 more levels.

8         So to begin with, the 5 is really not out of line

9    with the 5K1s that have been given.  On the other hand, I

10   could see going down a sixth level.  I can't see going down

11   beyond that very frankly, and that's where I am.  I think

12   that 97 months may be too close in terms of sentencing to

13   Mufid Isa, for example, who did not cooperate or his other

14   brother who did not cooperate.  I do think he's different

15   from Adnan Isa, and I don't want to suggest that they are the

16   same.

17        As far as the question of whether the government

18   singled out for the plus 2 enhancement, I mean, I think it

19   was based on -- from what I understand about this case in

20   roles and everything else, the plus 2 was not an unreasonable

21   request.  It is part of the plea agreement.  In other words,

22   if I'm going to say I disregard the probation officer's

23   recommendation of a plus 3 because the plea agreement said

24   plus 2, then I've got to stick by the plea agreement for

25   other purposes.

1          So what I am prepared to tell you, this a tentative

2    ruling right now so you know what to argue about, is that

3    from what I have heard, the most I would go down is another

4    level which would take your client to 87 months rather than

5    97 months and that is my thinking at the moment.

6          MR. KATZ:  Your Honor, first of all, thank you very

7    much for giving me the target to aim at instead of flailing

8    around.  Your Honor, I have a couple of thoughts on that.

9          First of all, I would really endorse the Court

10   going a few points lower than that and I just read you

11   something.  The government submitted a pleading with regard

12   to Mr. Hamayel.  At that point -- this is the government

13   saying this not me.

14          In this case, the Court has sentenced codefendants

15   to sentences that have been substantially lower than that

16   suggested by the guidelines and by the government's

17   recommendations including defendants who have offered no

18   cooperation at all, challenged the government's case through

19   lengthy motion practice and pled guilty late in the process.

20          The problem created by this circumstance is that it

21   serves to preclude the government from recommending sentences

22   that it believes are fair and reasonable based upon the

23   comparable analysis between individual defendants and the

24   larger group of more than 40 defendants on such factors as

25   the individual defendant's involvement in the charged crimes,

1    the timing of the guilty plea and the cooperation provided.

2           Because the Court has departed from the guideline

3    range and the government's recommendation in virtually every

4    sentence that has come before to date, we now find ourselves

5    in the position of having to recommend substantially lower

6    sentences then we believe are appropriate in order to ensure

7    the defendants who pled guilty, et cetera, et cetera.

8           Then they say such is the case with defendant Nidal

9    Hamayel.  Now, the reason that I point that up, Your Honor,

10   is that's not me saying it that the Court granted a lower

11   sentence to people who hadn't cooperated at all, who

12   challenged the government's case through lengthy motion

13   practice, et cetera, et cetera.  Then if you'll notice,

14   Your Honor, in the thing they filed Thursday, they said no.

15   Now, after having deviated and asked for lower sentences then

16   we think appropriate for Hamayel, Khahallah, and Shabib all

17   of a sudden now with Mr. Khalil Mohammed's case, they change

18   course.

19           THE COURT:  No, they changed course last week in

20   the another sentencing.  They abandoned that position earlier

21   on, but what I'm saying to you is even if that position were

22   still in place, I would not find a basis for going down a

23   couple more levels.

24           MR. KATZ:  Your Honor, I wasn't present for that

25   sentence, but I do think that from this entire record, the

1  tone of the argument but especially the really improper

2  scathing, ad hominum tone of the Thursday sentencing

3  memorandum which was meant to be an ambush, Your Honor, there

4  is a real question, and I think that the Court should

5  consider this in going a couple points lower, there is a real

6  question here as there is not in almost any case one can

7  imagine in the federal courts of the problem Mr. Stern feels

8  toward me which he could not have been more caustic about

9  affecting my client.  And I think that has to be seen in

10  context.  And you have to take this all with a really big

11  grain of, what is it, salt?

12         THE COURT:  Grain of salt.  And I am taking it with

13  a grain of salt.

14         MR. KATZ:  What the government is saying --

15         THE COURT:  Think about what you are saying.  I

16  mean, you are suggesting that Mr. Stern and all the people in

17  his office somehow are going to penalize Mr. Mohammed because

18  they have it in for, you and I'm not prepared to buy that,

19  Mr. Katz.

20         MR. KATZ:  Certainly his office doesn't have it in

21  for me.  I'm saying Mr. Stern seems to in this case.  And I

22  tell you, Your Honor, nobody could read that pleading from

23  Thursday and not conclude it is one of the most extraordinary

24  ad hominum attacks filed in the federal courts by an

25  Assistance United States Attorney.  It gives pause.  It gives

1    doubt I would suggest to you.  And he says, well, his office

2    made this determination, but there's nothing from his office

3    as to who made this determination.  There's just his say-so

4    with regard to that as well.  So I tried to focus myself here

5    as much as I can on what are the facts of what happened in

6    this case.  The facts of what happened --

7         THE COURT:  That's what I'm looking at.  I have a

8    probation officer who was mighty unhappy with you if you will

9    recall, and you came back and said you didn't intend to be

10   strident.  I read what Mr. Stern filed.  I don't feel about

11   it as you did.  I know that the two of you have had a

12   difficult relationship, but I expect and believe that both of

13   you live up to your responsibilities as officers of the court

14   and put that aside.  I think Mr. Stern has, and I think you

15   have.

16        MR. KATZ:  Well, this officer of the court has

17   never made that sort of ad hominum attack.  I have talked

18   about government conduct in certain cases, and normally, when

19   I have talked about it, the Court's agreed.  I thought it was

20   improper government conduct whoever caused it that my client

21   was out in San Bernardino, and then he was out in Kern

22   County, and Your Honor cured it both times.  I thought it was

23   improper government conduct that they were these articles in

24   the newspapers, and the Court made comments that put an end

25   to it.  And on and on again I could go where I made comments

1   about conduct.

2         But there is at least a question and I think a

3   strong one here about a personal animus toward me by the

4   individual prosecutor which is overlapping on my client.

5   That is why, Your Honor, I think it is so important to focus

6   on the facts because when the government says, oh, well, I

7   have a feeling, and the government has a better view, I would

8   give you that in a lot of cases, Your Honor, but I think that

9   it's somewhat tainted here.  I really do.

10        THE COURT:  Well, you're entitled to your opinion.

11  I just disagree.

12        MR. KATZ:  Now, Mr. Stern in his argument just now,

13  Your Honor, he knocked out a whole lot of straw men.  So let

14  me just make sure that I have presented the thing clearly.

15        First of all, Your Honor, all I did was quote an

16  Assistant U.S. Attorney in the related case.  That's all I

17  did.  And I said that in terms of when he first got into and

18  I think that says something different a tiny amount for

19  Booker.  It says a difference when you talk about the nature

20  of the offender.  It says a little bit different about the

21  offender then someone who gets into meth or gets into cocaine

22  and how he got into it.  And all I said is that he was like

23  the people, the Assistant U.S. Attorney in Chicago was

24  talking about when he talked about that.  That's all I was

25  saying.

1          THE COURT:  I understand, and that's one AUSA's

2     opinion.

3          MR. KATZ:  Now, with regard to supervising,

4     Your Honor, I have gone through the indictment and I have

5     gone through the plea agreements and in each of them they

6     explain, for instance, Adnan Isa was supervised by Nabhan

7     Isa.  It's not me saying so.  It's the indictment and it's in

8     his own plea agreement.  And in the plea agreements,

9     Your Honor, it's spelled out that Hamayel supervised people.

10    Mr. Stern would have you believe that if he went through this

11    record and tried to figure out who was supervising whom and

12    only Mr. Mohammed could be found supervising anybody and that

13    is not true.

14          And Your Honor, if they wanted to know about who

15    was supervising whom, they could have asked Mr. Khalil

16    Mohammed that question.  He would have been happy to tell

17    them about what some of those other folks like Khahallah were

18    doing that he knew about it.  Your Honor, it's quoted in the

19    papers exactly who they were supervising and they were

20    supervising people.

21          So what's my point?  My point is not to step back

22    from the 2 points that we agreed on.  It was obvious that

23    since you only have to supervise one person, there would be

24    about ten or a dozen people in this case who would get hit

25    with a plus two.  I thought it was obvious from my other

1    cases that my client would get hit with plus two.  The

2    anomaly here, Your Honor, is that nobody but Mr. Khalil

3    Mohammed got hit with a plus two.  That's an anomaly in this

4    case where the plea agreements and the indictment specify who

5    the other people were supervising.

6          And so what I am saying to you, Your Honor?  I'm

7    saying that is a plus 2 downward departure.  That is really

8    part of a 5K1 because it cannot be squared with the record,

9    and the indictment and their own plea agreements that they

10    didn't get hit for plus two just like my client.  So it

11    couldn't have been anything else other than an additional

12    plus two in reality for the early cooperation.

13          Now, in terms of -- I just want to talk a little

14    bit about this domino effect.  Different people can come at

15    different times in the case create different domino effects.

16    There's nothing in the record that shows what domino fell on

17    account of what domino with regard to Hamayel, Khahallah,

18    Shabib except maybe this one fellow that was brought in and

19    the comment he made about Hamayel.

20          My client can show you a domino effect.  If there

21    is some utility, Your Honor, and you want the defense bar to

22    know it, if there is some utility to saving a lot of trials

23    for the court and the government, this is the time to give

24    more than 6 points off, Your Honor.

25          They say Mr. Nabhan Isa told the government about

1    one load.  First of all, he didn't tell that out of some

2    altruism.  The government must think I don't know that.  He

3    said that because he wanted to get his competitor busted and

4    gain a business advantage of it.  So he didn't tell it from a

5    good point of view.  It wasn't indicative of him getting out

6    of crime.

7              And I would submit this to you, Your Honor.

8    Catching one load -- the DEA catches thousands and thousands

9    of loads.  Catching one load is not as great a public good as

10   saving three separate federal trials that would have happened

11   in this courtroom that the government would have had to

12   expend its resources on and that one of our district court

13   judges would have had to spend her resources on.

14             And Your Honor, I don't know, but we don't have to

15   show a linear thing.  They somehow have this test now, this

16   other straw man, some linear thing.  There was a cause and

17   effect here that the Court should recognize in saving the

18   Musitef trial.

19             THE COURT:  I am recognizing it.  I am not

20   suggesting that there wasn't a relationship.  All I am saying

21   is that saving the Musitef trial, while important, may not be

22   of the same importance as some of the persons who came in and

23   cooperated much earlier.  I'm not trying to send a message to

24   any lawyer because I think everyone has the right to defend a

25   case.  But when you get to cooperation and this is always the

1    difficulty, you have a back and forth between the lawyers

2    regarding who cooperated more or less.

3                 MR. KATZ:  Well, Your Honor -- did I cut you off?

4    I'm sorry.

5                 THE COURT:  No.  What I'm saying is I realize the

6    government thinks it has the best notion of whose cooperation

7    was the most important.  They always come in and say that,

8    and they get upset when I do something different than what

9    they suggest.  Having said that, I have seen enough of this

10   case, Mr. Katz, so that I have some sense, and I have my

11   views also regarding what made a difference in terms of

12   people pleading guilty.

13               And I believe that Mr. Shabib and some of the

14   people who pled very early on had a greater effect on

15   bringing more defendants in, and I'm not taking anything away

16   from Mr. Mohammed.  It seems no one disputes that he had a

17   big effect on Mr. Musitef and others.  The three trials

18   you're talking about are very important, but I think some of

19   the others saved me probably a 12 or 16 week trial.

20               MR. KATZ:  Your Honor, he had a huge impact,

21   though, also on Mohammad Hammad pleading guilty.  He had a

22   huge impact on his brother, and I don't know why his brother

23   keeps getting minimized.  It's so unfair, Your Honor.  He

24   didn't lie about his brother.  He's not like Nabhan Isa.

25   They wanted to give him a polygraph exam.  He said fine.

1    Your Honor, that is a make weight by this Assistant U.S.

2    Attorney to try to get the Court to keep this sentence high

3    rather than to bring it down a little bit where it belongs.

4         He was absolutely material and Abdallah Ayyeh would

5    have pled guilty and he would have gone and not pled guilty

6    but for him.  The idea, Your Honor, that his nephew somehow

7    convinced him to plead guilty, not the other way around makes

8    no sense on the facts of this case or in terms of the culture

9    or the family.

10        He also brought a fourth person in Amjad Ayeh.

11   That's four right there.  He did have an impact on Adnan Isa

12   and did have an impact on Jaris.  I made a mistake about

13   Alasoud.  I made a mistake in describing it.  He didn't talk

14   face-to-face with him.  He said you can talk to Izat Khalil.

15   He's the key to the case.

16        Your Honor, I want to mention another point.  The

17   government as I understand it, I don't know all their

18   recommendations, but I know that they recommended 6 on

19   Mr. Mohammed's brother.  Now, if that's not indicative of

20   some animus toward his lawyer that's affecting him, they

21   recommended 6 on his brother Abdallah Ayyeh.  I don't see one

22   trial that he saved and yet they recommend less on my client.

23        If they recommend just the 6, they would be where

24   Your Honor is.  If they give him one more point or the Court

25   would give him one more point, then his brother got off, he

1    would be down to 7.  Is that asking so much where he saved

2    four separate trials and his brother saved none to give him

3    more points?

4           Let's talk about the extraordinary family

5    situation.  I wasn't here at the Isa sentencing, but,

6    Your Honor, that is this case.  There are two productive

7    members of this family; Abdallah Ayyeh, his brother, who is

8    going to be in jail for however long it's going to be now,

9    he's got 70 months, and my client.  There's a third brother

10   Ibrahim.  Ibrahim makes very little money, very little money.

11   This is a family that's going through very strident times,

12   Your Honor, because you do have the money-making members of

13   the family in jail and both of them in jail together.

14          THE COURT:  That's true of every family in this

15   case.

16          MR. KATZ:  Well, I'm not so sure about that.  You

17   take somebody like Hamayel.  I don't know his whole family

18   situation, but it hits me that he was the only one in his

19   family.  I think Shabib was the only one in his family.  The

20   reason I mention this is there's two defendants who aren't

21   around as I understand it.  Of the six who are indicted

22   first, the top six, Hamayel is one of them.  No family.  I

23   think Shabib is in that category.  No family.  And I think

24   Khahallah is in that category.  No family.  So there are

25   quite a few.

1          And then you have this extraordinary situation.

2     And Your Honor, whether my client had the children with one

3     woman or with two, the reality is he's got I think it's 12.

4     He's got 12 children.   11 of them are minors, and they are

5     dependents, Your Honor.

6          Your Honor, I did want to address one more point

7     about timing if I could.   They said that well, some people

8     came in within 3 or 4 weeks, Your Honor.   And again, if

9     there's anyone to blame for that, that's for me.   3 or

10    4 weeks to try to digest a record like there was here was

11    simply not realistic.   So to say, well, the government

12    doesn't want to punish him, but they just don't want to give

13    him more credit, that's certainly not something he could have

14    done.

15         And a lot of people got arrested here in L.A., but

16    he didn't.   He got arrested in Las Vegas.   So it's a month

17    before he gets here, it's whatever it is, mid-February, and

18    then he goes off to Kern County.   That's a reality.   By the

19    time things start to settle down, the discovery is coming in,

20    you deal with Copy Pro, and all of that it's May.   I started

21    my intense pretrial preparation in the summer for that

22    4-and-a-half month trial.   I was then down there until

23    January 25th.

24         I mean, it was a real problem.   Mr. Mohammed wanted

25    me.   I didn't know what to do.   I guess I could have tried to

UNITED STATES DISTRICT COURT

```
 1   get out of the case, but there I was.  And then I came back,
 2   and I tried three more trials that year in federal court.
 3   And our intense preparation -- and then he was out in San
 4   Bernardino, and there was the problem with the computers.
 5   There was the separation order.  Your Honor, I'm here to tell
 6   you half the time I went down there, I couldn't see Mr.
 7   Mohammed.  I got turned away.  I only have so many
 8   opportunities that I could go down there.
 9           But I think the key to it, Your Honor, is after he
10   comes in, he gets his own domino effect.  And I don't know
11   exactly what the numbers were, but it sure seemed that a lot
12   of pleas happened right after he said he was going to plead
13   guilty.  With all this that we hear, I believe that he was
14   still maybe 8th, 9th, 10th in out of all these defendants.
15           THE COURT:  I don't think so.  I think he was a lot
16   later than that.
17           MR. KATZ:  How many were ahead of him?
18           THE COURT:  I would have to do the count.
19           Mr. Stern I think will know the answer.
20           MR. STERN:  I'm sort of astounded that defense
21   counsel is arguing that he was 8th or 9th or 10th in view of
22   the fact that per the Court's request, we were turning over
23   the plea agreements to defense counsel and putting them in
24   the discovery so he could see exactly when people were
25   pleading guilty and what the exact terms of their plea
```

1  agreements were.  Defendant was one of the last.  If we broke

2  this into three parts, I believe defendant was one of the

3  last people.

4           THE COURT:  I think he was in the last third, but I

5  don't know.

6           MR. KATZ:  At the very least, Your Honor, at the

7  very least, he was in the middle third.  But the point that

8  I'm trying to make is that after he says he's going to come

9  in, that's when his brother comes in on account of him.

10  That's when Amjad comes in, his nephew on account of him.

11  That's when Adnan Isa, that's when Amjad Jaris, that's when a

12  train of other people come in after that.  And that's the

13  reality.

14           THE COURT:  No, and you've made that point.  I

15  understand.

16           MR. KATZ:  And Mohammad Hammad and the information

17  about Ehab and the forfeiture was still something that was

18  out there on another judge's docket about 5 days away from

19  trial when he convinced his brother to settle that case.  And

20  all of these things, Your Honor, I think in terms of a

21  message and every case sends a message.  The only case that

22  ever existed that history ever knew about justice in our time

23  was this case.  I don't think that we send the wrong message

24  with giving him 7 or 8 points off instead of 5.  I don't

25  think it's so bad.

1          They say, well, I want them to be comparable to the

2    people who they say came in first.  He wouldn't be

3    comparable.  At 57 months, he would still get 11 more than

4    them.  Your Honor said 87 months.  I don't know if the Court

5    could at least be prepared to give him more of a break than

6    his brother got for his cooperation.  I don't see how that

7    can be squared.  I don't see how his brother can get

8    6 points.  People who didn't cooperate very much or as the

9    government said challenged the case got these big reductions.

10   Hamayel, Shabib, Khahallah effectively got 2 more points for

11   the role.  There are people getting 10, 12 points off.  My

12   client can't get 7 or 8 points off?

13          And when you add on top of it the extraordinary

14   family situation that he does have and the extraordinary

15   rehabilitation, Your Honor has a chance to look at over

16   3-and-a-half years of his life, I ask you, Your Honor, is

17   this so wrong to say he lied about his brother?  It is so so

18   wrong?  He did nothing but exemplary conduct for over

19   3-and-a-half years.

20          And you got a chance to look at him and see what

21   he's done, and he has changed his life around.  He has these

22   people who are dependent on him, Your Honor.  This is an

23   extraordinary family situation.  This is extraordinary

24   rehabilitation and someone who suffered an extraordinary

25   amount.

1          They say, well, go find somebody and complain to

2     OPR.  It was in state custody, Your Honor.  It's not some

3     vague statement.  His wrist was nearly broken.  It happened

4     at about midnight.  It happened at the jail.  We were

5     complaining about it at the time.

6          So Your Honor, taking all of these into

7     consideration, I would ask you, Your Honor, he did a great

8     deal, he really took extra steps, and he really did save the

9     Court and the government a lot of trials, a lot of time.  He

10    helped a great deal.  And I don't think giving him 1 or

11    2 points more than his brother got, it's still about 5 points

12    less effectively than these other people who were charged 2,

13    3 and 6 in the indictment.  Thank you, Your Honor.

14          THE COURT:  Mr. Stern, anything more?  Then I want

15    to hear from Mr. Mohammed obviously.

16          MR. STERN:  Briefly.  We recommended 6 points for

17    defendant's brother but not for substantial assistance.  If I

18    remember correctly, we recommended 3 for his brother for

19    substantial assistance, and we were still in the process of

20    trying to square sentences with the earlier lower sentences

21    that the Court had offered.  So we only recommended actually

22    3 for defendant's substantial assistance.  And then in an

23    attempt to create this comparative analysis, we recommended

24    an additional 3.

25          MR. KATZ:  Your Honor, I was here in court.  It was

UNITED STATES DISTRICT COURT

1    6.

2              MR. STERN:   3 plus 3 is 6.   It was a total of 6,

3    that's correct.

4              MR. KATZ:   6 for cooperation.

5              MR. STERN:   But the papers speak for themselves,

6    and the Court is welcome to go back and look at the papers.

7    I did not look at them right before court.   If I remember

8    correctly, that's how we did it.   I have no objection if the

9    Court wants to look at the papers.

10             THE COURT:   I'm going to have to take a recess to

11   look at it, but I want to hear from Mr. Mohammed first.

12             MR. STERN:   But may I also say something else?

13             THE COURT:   Yes.

14             MR. STERN:   Defense counsel seems to be of the

15   impression that the recommendation that we're offering is

16   because of my distaste for him.   And I indicated in my papers

17   and I will indicate again, I don't dispute that I dislike

18   defense counsel.   I think it's very clear as the Court has

19   seen this case develop why and I explained the reasons why

20   including from the beginning being accused of essentially

21   being someone who ethnically hates Arabs and is prosecuting

22   people just for that reason, and then it just escalated from

23   that point on.

24             MR. KATZ:   I didn't say that.

25             THE COURT:   I'm just not going to get into this

1    discussion because both of you are demeaning your positions

2    when you get into this back and forth, and I'm not going to

3    look at the relationship between the two of you.  I recognize

4    it's not good, but I'm not going to permit that to hurt

5    Mr. Mohammed in any way.

6            MR. STERN:  And that's what I'm trying to get at.

7    While I acknowledge I do not like defense counsel for the

8    reasons I explained in my papers and many more, I made very,

9    very strong efforts to ensure that the recommendations that

10   our office was making had nothing to do with my feelings for

11   defense counsel at all.

12           And, in fact, the decision to essentially ensure

13   that we start recommending what we believed to be appropriate

14   sentences from an objective standpoint and not consider the

15   Court's other sentences was actually not my decision.  It was

16   a decision that was contrary to what my position had been in

17   the office and it was a decision that was made by the

18   criminal chief in the office.  And I understand frankly why

19   he thinks that's appropriate, and I think it's perfectly

20   reasonable and appropriate.

21           But the point that I'm trying to make is that I

22   wasn't somehow trying to change the government's position

23   mid-stream in order to somehow be punitive against the

24   defendant based on my feelings toward his counsel.  That

25   absolutely did not occur.  And all of the decisions with

1    respect to 5K motions are reviewed by the chief of the

2    narcotics unit and ultimately the chief of the criminal

3    division, and that's what happened in this case.  And our

4    decision with respect to what we're recommending is based on

5    the defendant's cooperation period.

6            MR. KATZ:  Your Honor, I would appreciate if you

7    would review what was recommended on the others including his

8    brother because I still have that same feeling, and I think

9    it's just unfair for it to read down on to my client.

10          THE COURT:  If you give me 1 minute, I'll go look.

11          MR. KATZ:  May I speak with him about what he would

12    like to say while Your Honor is looking?  Would you mind?

13          THE COURT:  You can certainly do that.  I will go

14    look at this with Mr. Arajuo and see if we can't get to the

15    bottom of it.

16                 (Recess taken.)

17          THE COURT:  First of all, with regard to Mr. Ayyeh,

18    the government did move for a 6-level departure based on

19    cooperation.  That's exactly what the brief says.  And you

20    have a footnote saying you're comparing the cooperation of

21    the parties, but there's no discussion of the 3-level

22    departure plus an additional 3 based on the statute.

23          MR. STERN:  Then I apologize.  I thought that I had

24    done that.

25          THE COURT:  I understand, but it appears you did

```
 1    not.  You may well have gone through that process mentally.

 2    I'm not doubting that.  I'm just saying, though, that's what

 3    it said.

 4              MR. STERN:  That's what our assessment was.

 5              MR. KATZ:  Your Honor, I appreciate you taking the

 6    time and looking that up.

 7              Your Honor, just two things, then my client would

 8    like to address you.

 9              THE COURT:  Sure.

10              MR. KATZ:  One is that, you know, Mr. Mohammed was

11    actually threatened, and his wife was actually threatened so

12    that's not a distinction between him and Mr. Sanam.  And he

13    was willing to walk into the lion's den in the Azut trial

14    knowing that that was someone who had put a gun to somebody's

15    head.  But once he threw himself into this cooperation, Your

16    Honor, he threw himself in 100 percent.  I mean, he's just --

17    he's been phenomenal in my experience.  And I don't know, I

18    just don't seem to have the words to be able to get that

19    through to the Court, just how phenomenal and helpful he was.

20              THE COURT:  All right.

21              MR. KATZ:  The last thing, Your Honor, is just for

22    the record, I didn't give any legal advice Ahmad Jaris.

23    Mr. Mohammed telling him to plead guilty is not the same as

24    his lawyer giving him legal advice.

25              THE COURT:  Okay.
```

UNITED STATES DISTRICT COURT

```
 1              Let me hear from Mr. Mohammed.
 2              DEFENDANT MOHAMMED:  Thank you, Your Honor.  I know
 3      you couldn't take it from my lawyer and my prosecutor for a
 4      moment, but I've been taking it for 3-and-a-half years
 5      already.  You know?
 6              First of all, I want to start when I decided to
 7      plead guilty, I tried to plead guilty from Day 1 if I was --
 8      if I find out I was guilty.  But the prosecutor, he gave me
 9      16,000 pages to read and 5,000 tapes to listen to.  I didn't
10      know I was guilty at all in the beginning till I find out
11      from the law inside the jail that selling pseudoephedrine for
12      some people who's doing it is illegal.  I know it in the
13      jail.  When I know it in the jail, I decided I must start
14      working my out to go and cooperate as much as I can.
15              And Mr. Stern, he didn't give me the chance for
16      sending me here and there.  I spent one month in Las Vegas,
17      and then from Las Vegas to San Bernardino, and I spend a few
18      days there.  And then he send me -- instead of tell to me the
19      right way, if you want your way down to get 3 years like the
20      others, you can get -- you can just come and cooperate with
21      us.  But he didn't do it, and he didn't give me no chance at
22      all.
23              And instead he send me to Kern County for 3 months
24      there.  And then I was working my way up to come to MDC to
25      see if I can even see my discovery, take a look at my
```

1  discovery for the first time after 4 months.  I didn't see

2  it, and I didn't even hear one tape during that time when I

3  was in Kern County till I came here.

4        When I came here, I was trying my best to listen to

5  the tapes to see at least why I am here, why I am at MDC, why

6  I'm in jail, to find out what kind of indictment I had.  I

7  didn't know what kind of -- I didn't even know what

8  conspiracy means.  I didn't know nothing about why they

9  brought me to the case, why they put me No. 1.

10        Is it my problem if they were recording my phone

11  and they didn't record some other people's phone?  And they

12  put me No. 1 as I was giving some people direction to do.  If

13  they record Mohammed Shabib's phone, they will get more

14  evidence than what they got on my phone and if they recorded

15  Mohammed Khahallah's phone, too.  But unfortunately, my phone

16  was the easiest one for them, and they just get the evidence

17  and the information about my phone only.

18        And I know myself, I wasn't giving nobody,

19  directing nobody except if I need some help, I just ask my

20  nephew to do something for me because I expect my nephew to

21  do it no matter what unless if he knows he was doing illegal.

22  But I ask him to do me a favor, he will do it.  And if he ask

23  me to do a favor, I will do it.  I wasn't directing him the

24  way -- how they put it out.

25        And at the same time Mr. Stern, he's telling me in

1    the papers like the past 2 years I was challenging the

2    government.  I am not challenging no government.  Countries,

3    they cannot challenge the government of the United States.

4    Mohammed Khalil to come and challenge the government, I

5    didn't challenge the government.  I didn't understand what he

6    wants from me.  That's all.  And when I understood what he

7    wants from me, I went right away, and I start cooperating

8    from Day 1.  I told him I'm going to be truthful, and I will

9    say whatever truthful -- whatever truth, I will say it to

10   you, and I will be helpful as much as I can.

11           And he appreciated that, and he told me,

12   Mr. Mohammed, we don't want you to say nothing except about

13   one person only which he's telling me now he doesn't want to

14   give me no credit for nobody else.  No.  He told me just I

15   want you to speak, and we want to focus on someone only.  We

16   don't want -- know you have some other information, but we

17   want it delayed.  And most of the information which I want to

18   say, it's still delayed, still delayed.  And he didn't hear

19   it.  And I came to cooperate because I want to get any kind

20   of credit as I can, as much as I can from the government.

21           Yes.  The one person he was -- he wants to be

22   focused on which it was Tony Musitef only because at that

23   time, he didn't plea.  And I told him Tony Musitef, he is

24   very easy, but I want to say something more important than

25   some other people, but they said no, no.  We want to just

1    focus on Tony Musitef only.

2        Because I know if I talked to Tony Musitef one time

3    or two times, I will make sure he is guilty because I know

4    now he is guilty. And that day I know he is guilty, and I

5    can convince him. And I can convince him to come and save

6    the government all that time and to save himself going to the

7    trial and lose the trial because I know I'm going to be

8    standing against him on the trial.

9        But about my brother, about my brother, I sit with

10    my brother more than 2 years inside the jail just trying to

11    convince each other, okay, when we find out that we should do

12    something with the lawyers and take advice from the lawyers.

13    When we took the advice from the lawyers now, wait, wait,

14    wait. When the time came, we start convincing each other --

15    I convinced him so much we have to. Even he wasn't -- till

16    this moment, he knows himself he's not guilty.

17        And even in the sentencing day, he was asking, do

18    you want to withdraw the plea? I know this because he knows

19    till now, he is not guilty, and I convinced my brother to

20    come. And I know my brother, he wants to go to the trial 100

21    percent, and I work on him 100 percent, too, just to convince

22    him to come here. This is to get that credit for myself and

23    at the same time to save -- to save him from going in a bad

24    avenue.

25        And about Amjad, I did the same way. I did what I

```
1    can.  He's my nephew, and he listen to me.  He was listening
2    to me when I was outside, and he was listening to me when I
3    was inside, and he was taking the advice from me.  He didn't
4    even take it from his own lawyer as much as he took it from
5    me.  He went and he said to the government on the 14th floor
6    one day -- like one month before, and he refused even to
7    talk, to cooperate because he was not convinced till I put
8    the pressure on him in the way to convince him to come and
9    plead, and he did this.
10         And I came, and I brought with me my brother and my
11   nephew and Nabhan Isa which I was talking to Nabhan Isa every
12   day.  We have to, we have to, we have to.  Okay, because we
13   know, we have evidence, and at the same time, we did
14   something wrong, and we have to go and cooperate with the
15   government.
16         And finally, he said okay, work it out, and let's
17   go, and the four of us will go together.  And that's what we
18   did.  We came four of us together this courtroom in front of
19   you, and we pleaded guilty before even we cooperated, before
20   we sit with the government one time to show how good still I
21   tried to deal with the government.
22         And the government when we were there, they
23   promised so many things for us.  Mr. Mohammed, you're doing
24   very good.  Mr. Mohammed, you're doing just like Shabib.  Mr.
25   Mohammed, you are gonna get the same thing.  When they needed
```

1    me, when they needed me, maybe when they know Musitef was

2    going to the trial, their language was different than the end

3    of the language just like now.  I don't know.  I don't know.

4    What looks like.

5         And when it comes to -- there is so many issues.

6    When it comes to Mohammad's suit, I tried my best to talk

7    about Mohammad's suit and to go to the trial.  I know the man

8    is dangerous, and I know him from outside.  And I know he is

9    going to the trial, and I offered myself to say whatever I

10   know about him and to go to the trial.  And even I know it's

11   going to be -- maybe my family will be in danger, but I offer

12   my help to the government.  And they told me just wait on the

13   side till we finish.  If we need you, we will ask for you, if

14   we don't need you -- and it happened, and they didn't need my

15   help.

16        I tried some other things which Mr. Katz didn't

17   even mention, that I tried to help the government for people

18   who knows Said Abdelaziz before he went to the trial.  Like

19   Isak Khalil, I told him he dealt with him.  And Abdeen,

20   somebody's name, Abdeen, I called him Mr. Ted Salamay, and I

21   called him Abdeen, he's in custody, and he's willing to

22   testify against Said.  They didn't even mention that, too,

23   which I was doing my best to get any credit I can and to tell

24   the truth whenever I go.

25        During the time when I was cooperating with the

1      government, as much as I was talking to Mr. Stern and at the

2      same time, I was talking to Ted Salamay, and sometimes I talk

3      to Scott Pagel.  Mr. Ted Salamay, he wants me out a few times

4      to help outside as much as I -- you know.  And we try to talk

5      to Mr. Stern like that and to ask him, the government, they

6      needed my help outside, and he refused.  And after that, I

7      stopped seeing Mr. Salamay in the office which I went to the

8      office after him maybe another six, seven times.  I never met

9      with Mr. Salamay or what happened with him, I don't know.

10          When the time came, and they brought Mohammad

11     Hammad, they didn't bring Mohammad Hammad because -- because

12     they have enough evidence on him after we got caught.  No.

13     They brought Mohammad Hammad because they have enough

14     evidence from me, from my tapes, from the way how I was

15     expressing my feelings toward Mohammad Hammad.  How come he

16     is outside?  I said that to them so many times.  He was

17     outside.  Why he's outside and we are inside?  Why is --

18          He's one of the big dealers, one of the people who

19     buys from every one who sells pseudoephedrine.  He bought

20     from me.  He brought from Nabhan Isa.  He bought from Mufid

21     Isa.  He bought -- he buys pseudoephedrine from so many

22     sources.  Why he's outside and we are inside?  And I have

23     enough evidence to prosecute him.  And I found the real tapes

24     and the good tapes to prosecute him.

25          And before even they talked to me, they want me to

1    go through all the 5,000 tapes to find his voice in all those

2    tapes, and I told them I want to save you all this time, and

3    I want to get you exactly the where is the phone calls for

4    Mr. Mohammed Hammad with me.  And I did it within maybe

5    half-an-hour instead of maybe 5 months if I want to look for

6    those tapes.  Okay.

7            About Nabhan Isa, just to say it again, Nabhan Isa,

8    he get more points than me, and he was found liar on so many

9    occasions.  And the government's saying he gave the

10   government 1,000 case.  Believe me, I know the whole story.

11   He didn't give the government no cases.  He just want to hurt

12   Isawi.  That's all.  Not to help the government but to hurt

13   Isawi in this way.  He can sell his other thousand cases on

14   other side of the town.  Okay.  And that's what he did, and I

15   know that for sure.  Okay.

16           About Mr. Sallal, I don't know what Mr. Sallal, he

17   gave cooperation to government, but Mr. Sallal, he got 8

18   points.

19           About Mr. Stephen Almasri, I think few day ago, you

20   gave him 51 month.  That's mean he got more than 9 points

21   from the government and from you which what he did, I think

22   he did nothing except explaining the phone calls for the

23   government which I did in so many occasions, and I did the

24   same thing to the government so many occasions.

25           Plus I say I saved myself from going to the trial

1    to the government which I know myself, I should get credit on

2    myself for getting -- not going to the trial and not taking

3    my brothers and not taking my nephew and not taking Ahmad

4    Jaris which Ahmad Jaris, I lived with him for more than 6

5    months.  He's making it like it's nothing, but I did so much

6    influence on Ahmad Jaris to make him plead guilty.  I did

7    what I have to do.

8            And till now, even till now, I called the

9    government 3 weeks ago, I don't know why there's something

10   between him and Katz, 3 weeks ago, and I told him there was a

11   crime going on inside the jail.  And then he said, okay, how

12   is it?  And I explain it to him.  And then I told him -- I

13   called him again -- I told Mr. Scott Pagel again it's

14   happening.  And then he ask me did Mr. Katz know about?  I

15   said no.  He said -- he said you should tell him because we

16   know already he knows.

17           What does that mean?  As long as Mr. Katz knows

18   about it, that's mean you want to leave the crime going on or

19   whatever?  I don't know.  That's mean they have something

20   against Mr. Katz.  And they don't want me to even get the

21   credit for that, and they don't even want to stop that crime?

22   They -- you know, they just wanted to go and because the

23   relationship with Mr. Katz, and I have no idea what's going

24   between them and Mr. Katz.

25           And at that time if I want to explain myself and my

1    family, how they've been living through the past 3 years, I

2    think it's better if I let my wife talk about it because

3    she's living it moment after moment, day after day, and she's

4    having the suffering which I would be talking about me.   And

5    her every phone call and every visit, I see her, and we talk

6    about to raise the family in the right manner in the right

7    way.   And -- yes, yes.

8            MR. KATZ:   Your Honor, could I have Ms. Raja Atrash

9    come forward for just a moment?   I don't really know what

10   she's gonna say, but apparently --

11           THE COURT:   Yes.   She may.

12           MR. STERN:   Your Honor, thank you very much for

13   your taking the time to Mrs. Mohammed.   Just for the record,

14   I think Ted Salamay is a DEA specialist.

15           THE COURT:   I know who Ted Salamay is.

16           MR. KATZ:   Mrs. Raja Atrash.

17           MRS. ATRASH:   Hi, Your Honor.   As Mr. David Katz

18   was saying earlier about my situation, I was the one that was

19   in the situation.   You know, talking about is way less

20   painful than going through it and going through the torture.

21           Ever since my husband has been gone, he has left me

22   8 kids and $300 in my pocket.   We had a lot -- we went

23   through a lot of ups and downs in our lives.   And if it

24   wasn't for Samir Mohammed which is my stepson back there, he

25   had to throw all his education away.   He was planning on

1    going to college.  And on one day, he just woke, and he was

2    responsible for eight kids to take care of and put food on

3    the table, clothing on their back and a roof over our head.

4    Instead of him doing that, he should have still had his dad

5    to take care of him in that kind of manner.

6              I have been thrown from one house to another, and

7    there was times that I couldn't pay my rent for 2 months in a

8    row.  I had the Sheriff Department come and take all my stuff

9    out and throw them in the front yard.  I had no place to go.

10   I went to the shelter for just 1 hour.  I sat there, and they

11   had explained to me that they only have room for three

12   people, and then the other -- every two other kids has to be

13   transferred to a different shelter in order for them to have

14   room.

15             That's when I turned to my dad, and he's also

16   available here in this courtroom, and we all had to live with

17   him for a month in Upland.  My kids, they couldn't attend to

18   their schools and -- because I couldn't afford the gas.  We

19   lived in Moreno Valley at that time.  Their grades was

20   falling apart.  I didn't know what to do.  I didn't have a

21   job.  I didn't have any money so I started borrowing money,

22   and I'm up to my head with debts right now.

23             All I can say is my husband's always provided

24   everything for these kids.  And he's always loved them and

25   cared for them.  All I'm asking is my husband should be home

UNITED STATES DISTRICT COURT

1   where he belongs with his kids.  He is much more needed to be

2   at home with his kids than a jail cell would ever need him.

3   Thank you so much for your time.

4         THE COURT:  All right, thank you.

5         MRS. ATRASH:  Mm-hmm.

6         MR. KATZ:  Thank you, Your Honor.

7         MR. STERN:  Your Honor, may I respond to a couple

8   of the comments that Mr. Mohammed made?

9         THE COURT:  Well, I don't know if Mr. Mohammed's

10   finished yet.

11         Are you finished, Mr. Mohammed?

12         DEFENDANT MOHAMMED:  All what -- all what I'm

13   asking from the government to put everything under

14   consideration for what I did, what I been through and what I

15   face and how much I put my family in danger.

16         Thank you very much, Your Honor.

17         THE COURT:  All right.

18         Okay, Mr. Stern, what did you want to say?  Keep it

19   brief, please.

20         MR. STERN:  I feel for the family because it's

21   always difficult for the family who had nothing to do with

22   criminal activity whatsoever.  The problem is that all

23   defendants bring with them typically family, and it's a

24   difficult situation for the Court to make the assessment

25   about what's an appropriate sentence when the family has such

1    an emotional impact on any of us who listen to what's going

2    on with them.

3            To the extent that they had financial issues, I do

4    know that the brother, Abdallah Ayyeh, recently settled his

5    forfeiture case with Asset Forfeiture Division and I believe

6    received somewhere 40 and $60,000 in cash back from the

7    government.  Mr. Katz I'm certain knows better because he

8    handled that case.

9            MR. KATZ:  Your Honor, that was minus an attorney's

10   fee, and then the remainder went to pay credit card bills.

11   There was no --

12           THE COURT:  I'm assuming that the financial

13   situation of the family is --

14           MR. KATZ:  Awful.

15           THE COURT:  I'm assuming that, and that's true of

16   many of the families.  Now, having said that, it is something

17   that disturbs me greatly, but I've got to also ask myself how

18   did we get here?  And we didn't get here because of something

19   you did, Mr. Katz, or something Mr. Stern did or something I

20   did.  And so it is a difficult, difficult problem, but I

21   really have to ask myself whether the mitigating factors are

22   such that that deserves a further departure.

23           I mean, I am sad to say I don't think it does in

24   this case.  I understand this has been a terrible experience

25   for the family.  My heart goes out to the family.  But I

1    think that every family -- not every family but almost every

2    family that has had a loved one who's been a defendant in

3    this case has suffered greatly.  The Isas certainly have.

4    Others have.  So I think that's enough said on that.

5         I do think, though, as I've indicated earlier, it

6    is completely unfair that Mr. Mohammed have a 5-level

7    departure and his brother a 6-level departure because I do

8    think Mr. Mohammed probably -- his decision probably broke

9    the decision of the family to come in together.  On the other

10   hand, I have to balance that against the fact that we are

11   talking about someone who had a much more significant role

12   than his brother.

13        Now, that doesn't mean that his cooperation should

14   be minimized, but I do think if I start looking at this in

15   terms of the overall factors that I may look at after Booker,

16   I still think that there has to be some proportionality here,

17   and that's why I think he probably should have a sentence

18   longer than his brother's.

19        But I cut Mr. Stern off so let me --

20        MR. STERN:  What I also want to say was we did tell

21   Mr. Mohammed on several occasions that he was doing very well

22   because we thought he was in many respects being very candid

23   with us, being very forthcoming with us, providing us with

24   lot of helpful information, in particular those two tapes

25   that I thought were very helpful in the Musitef case that we

1    hadn't either found or didn't appreciate the value of.

2         But to the extent that Mr. Mohammed told the Court

3    that either I or someone else said to him, you're going to

4    get the same thing as Shabib, that is not true.  Because

5    anytime the defendant or his counsel, and they regularly did

6    try and pin us down to exactly what we were going to

7    recommend, broached that subject, we specifically said we

8    would not, we could not discuss what type of recommendation

9    we would make.  So there's no question that that type of

10   discussion never occurred.

11        To the extent the defendant's saying you're not

12   giving me anything for pleading guilty myself, I mean, I

13   stopped my own trial for occurring, that's not true also

14   because he got 3 levels off for acceptance of responsibility.

15        THE COURT:  I understand.  You know, I think now

16   we're just sort of micro managing.

17        MR. STERN:  And just finally then may I say, again,

18   there seems to be some notion that my relationship with his

19   defense counsel may have stopped him from as recently as 3

20   weeks ago giving information to the government, and that I'm

21   somehow stopping that because I don't like his defense

22   counsel.

23        What I can say to the Court is that Mr. Mohammed

24   would routinely call Agent Pagel and Agent Salamay who the

25   reason he was no longer in our debriefings was he was

```
 1    transferred to a different unit.  He's no longer in the
 2    Riverside office.  But when Mr. Mohammed would call Agent
 3    Salamay and Agent Pagel, and then the agents would tell me
 4    about it, I mentioned that on occasion to defense counsel who
 5    indicated very clearly that he did not want the government
 6    talking to Khalil Mohammed without him being present.  So I
 7    specifically indicated to the agents that if the defendant
 8    calls, not to talk to him because I didn't want to violate
 9    the direction that I had received from his counsel.
10         So I understand why he might not understand this
11    but the direction to the agents which is we can't talk to you
12    without your attorney came from me, and it was our attempt to
13    try and, you know, recognize and respect that direction we
14    had received from his counsel whether or not to talk to him
15    without him being present.
16         MR. KATZ:  Mr. Mohammed called and had given
17    information to Mr. Salamay if he'd answer the phone and to
18    Mr. Pagel.  I have -- he's also called -- he's given
19    information right up until three weeks ago.  They took the
20    information and that this was fine.  Your Honor, the
21    conversation that he had was with Mr. Salamay, the one that
22    Mr. Stern said wasn't with him.  It was with Mr. Salamay.
23         Your Honor, if I can just close with this very last
24    thought.  He's talked about and I have talked about it and we
25    don't know all the details.  A lot of what he says is hearsay
```

1      at the prison and I could be wrong on some numbers.  The

2      Court will know better.  It appears Sallal got 8 points.

3      Almasri got 9 points.  As I talked about Isa, he was charged

4      among the top 4 and he is -- here's a funny thing.  They

5      didn't charge these people alphabetically.  They charged them

6      with role.  They were telling, you know, oh, they weren't big

7      players.  No information.  I didn't charge Mr. Hamayel Number

8      2 out of 42 defendants, Mr. Stern did.  I didn't charge

9      Mr. Khahallah number 3 out of 40 some defendants, the

10     government did.  They charged Shabib way up there.  They

11     charged these other people way up there.

12          The reality is these people effectively did get 12

13     points.  When Your Honor says they have to be comparable, I

14     agree with Your Honor there that is to be proportionally and

15     really step back from this six points for his brother who

16     provided no discernible cooperation and he provided so much.

17     What message do we send to that Amjad Jaris his main

18     cooperation I think was to bring himself in.  He apparently

19     got and Sallal got 8 points, Almasri 9.  Other people

20     effectively got 12.

21          If Your Honor could please, especially since

22     apparently there's no reduction being given on a downward

23     departure request for the extraordinary family obligation,

24     Your Honor, if you could please see your way to at least

25     giving him 8 or 9 points off for his cooperation and the

```
 1    range would be 57 months to 63 months, something like that.

 2    That's what proportional and it takes into account his role

 3    and he will still be two years higher or more than the

 4    people, the next three in the indictment in role.  Those are

 5    high role people I'm comparing him to.

 6              THE COURT:  I just don't agree.  Sentencing is the

 7    thing I absolutely abhor, and I hope that the judgments I

 8    make are fair and appropriate, but I just think -- I think

 9    that a 6-level departure is appropriate in this case.  I do

10    not think anything more based on what I've heard today is

11    appropriate.  There may -- for all I know, there may be a

12    reason in the future that causes me to come back and revisit

13    this, but for today, I think the answer is the 6 levels, and

14    I intend to sentence Mr. Mohammed to 87 months.

15              I will recommend him to the Drug and Alcohol

16    Program at the Bureau of Prisons in the event you think that

17    would be of assistance in terms of a sentence reduction,

18    Mr. Katz.

19              MR. KATZ:  Your Honor, I appreciate Your Honor

20    recommending the drug and alcohol program.  Also recommending

21    a camp somewhere here in Southern California.

22              THE COURT:  And I'm prepared to do that if he's

23    camp eligible.

24              MR. KATZ:  Your Honor, I --

25              THE COURT:  I think that's something for you folks
```

```
 1    to take up.
 2              MR. KATZ:  Your Honor, I know we've been at this a
 3    long time, but his brother got 6 points for cooperation.  He
 4    avoided three trials.  What message does that send,
 5    Your Honor?
 6              THE COURT:  Mr. Katz, I've heard you say that.  I'm
 7    not persuaded, and I am going to sentence as indicated.
 8              All right.  Are we prepared to have me pronounce
 9    sentence at this stage?
10              MR. KATZ:  Could we have a moment, Your Honor?
11              THE COURT:  Sure.
12              MR. KATZ:  Your Honor, may I have just one moment
13    to discuss something with defense counsel?
14              THE COURT:  Sure.
15              MR. STERN:  I don't object to it.
16              THE COURT:  Fine.
17              MR. KATZ:  Your Honor, thank you very much.  We
18    just discussed obviously Rule 35 and hopefully having another
19    meeting, and we're prepared to go forward.
20              MR. STERN:  May I just clarify something, Your
21    Honor?  I don't want there to be any misunderstanding.  The
22    plea agreement indicates that the defendant has a continuing
23    obligation to cooperate about those events that are the
24    nature of what he was telling us about and --
25              THE COURT:  Right.
```

UNITED STATES DISTRICT COURT

1        MR. STERN:  -- about those events that he has

2    collected knowledge of to this point.

3            Now, I've explained to his counsel and him because

4    I don't want there to be any miscommunication or

5    misunderstanding that Rule 35s are always a possibility in

6    circumstances, for instance, where someone gets sentenced and

7    they go to jail, and they learn about criminal activity that

8    they were not aware of at the time that they were cooperating

9    with the government.  So, for instance, if defendant got

10   sentenced -- gets sentenced now, goes into custody and learns

11   that there's a drug ring in the jail and provides us with

12   information about it, there's certainly a possibility under

13   that circumstance that he may get a Rule 35.

14           But as I put in the plea agreement and as I've

15   described to defendant and counsel, Rule 35s don't come in

16   drips and drabs for every incremental piece of information

17   that he provides that he's aware of at this point in time.

18   If, for instance, a fugitive who is arrested -- excuse me, if

19   someone who's a fugitive gets arrested is going to trial and

20   we ask him to testify, he's required under the terms of his

21   plea agreement to testify to that, to give truthful

22   information without getting additional benefits for that.

23           That's the nature of the terms of our agreement.

24   And I don't want anything I've said to him or to his counsel

25   to be misunderstood, and that's why I'm placing it on the

1    record.

2         MR. KATZ:  Your Honor, I'm not sure that I agree

3    with that reconstruction of the plea agreement.

4         But I think the key thing is that there are these

5    people out there like Amir, Hammad and Almasri and so forth.

6    And if may client were to learn somehow that there was

7    another shipment that was taking place because I mentioned

8    already that we believe these people still have ongoing

9    operations -- I said we, Mr. Mohammed believes that, his

10   intention would be to bring that information to the

11   government's attention.

12        I was just pointing out that the government has

13   been very busy.  We understand that.  They haven't had a

14   chance to explore all that.  He would bring that information

15   forward, the government would have a meeting with him, and

16   then obviously, it's up to the government to evaluate that

17   information.  That was more the prospective cooperation or

18   Rule 35 that we had in mind.  Obviously, if he learns of a

19   prison drug ring, that's an easy one.

20        THE COURT:  All right.  All right.  Well, the point

21   is I'm not going to weigh in one or the other on that.  It's

22   something that hasn't, you know, occurred.  If it's brought

23   to my attention, down the road, I'll deal with it then.

24        All right.  Then it is ordered that the defendant

25   shall pay to the United States a special assessment of $100

which is due immediately to the Clerk of the Court.

Pursuant to Section 5E 1.2 E of the guidelines, all fines are waived as it is found that the defendant does not have the ability to pay a fine.

Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant, Khalil Mohammed, is hereby committed on Count I of the indictment to the custody of the Bureau of Prisons to be imprisoned for a term of 87months.

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of 5 years under the following terms and conditions:

1. The defendant shall comply with the rules and regulations of the U.S. Probation Office and General Order 318.

2. The defendant shall participate in outpatient substance abuse treatment and submit to drug and alcohol testing as instructed by the probation officer. The defendant shall abstain from using illicit drugs, using alcohol and abusing prescription medications during the period of supervision.

3. As directed by the probation officer, defendant shall pay all or part of the costs for defendant's drug treatment and alcohol treatment to the aftercare contractor during the period of community supervision pursuant to Title

```
 1    18 United States Code, Section 3672.  The defendant --

 2              MR. KATZ:  Your Honor, could you say that again?

 3              THE COURT:  Sure.

 4              MR. KATZ:  Mr. Mohammed didn't understand it, I'm

 5    sorry.

 6              THE COURT:  As directed by the probation officer,

 7    the defendant shall pay all or part of the costs for the

 8    defendant's drug treatment and alcohol treatment to the

 9    aftercare contractor during the period of community

10    supervision pursuant to Title 18 United States Code, Sectio,

11    3672.

12              MR. KATZ:  Thank you.

13              THE COURT:  Defendant shall provide payment and

14    proof of payment as directed by the probation officer.

15              4.  During the period of community supervision, the

16    defendant shall pay the special assessment in accordance with

17    this judgment's orders pertaining to such payment.

18              The Court further recommends that the defendant be

19    placed in the Bureau of Prisons 500-hour intensive drug and

20    alcohol program.  And the Court further recommends the

21    defendant be permitted to serve his term at a camp facility.

22              MR. KATZ:  Thank you, Your Honor.

23              THE COURT:  All right.

24              MR. KATZ:  Your Honor I think there are two more

25    things for the record.  I think one, I don't have a
```

UNITED STATES DISTRICT COURT

1   photographic memory of the plea agreement, but it's probably

2   advisable to admonish him about his right to appeal.

3          THE COURT:  I am going to right now.

4          Mr. Mohammed, you have reserved limited rights to

5   appeal in your plea agreement, and you must appeal within

6   10 days of the date of this sentence.  If you cannot afford

7   to pay for counsel, counsel will be appointed for you.  Do

8   you understand that?

9          DEFENDANT MOHAMMED:  Thank you, Your Honor.

10         MR. KATZ:  Your Honor, I think someone else had

11  this issue.  It would not be my intention to represent Mr.

12  Mohammed on appeal if he were to pursue an appeal.  I would

13  make sure that his notice of appeal gets filed.  I wonder if

14  the court would be willing to relieve me after -- on appeal

15  after filing the notice of appeal.  I'm happy to stay on as

16  his attorney in this court.  For instance, if we do the Rule

17  35 or something like that, I'd like to see that through and

18  help him as much as I could.  But I'm just not interested in

19  doing an appeal.

20         THE COURT:  Well, the answer on this is very

21  simple.  One, I expect you to file the notice of appeal.  I

22  will not leave Mr. Mohammed without counsel so we are going

23  to have to appoint appellate counsel immediately on your

24  filing the notice of appeal.  And --

25         MR. KATZ:  Would Your Honor be willing to do that?

UNITED STATES DISTRICT COURT

1          THE COURT:  What?

2          MR. KATZ:  Would Your Honor be willing to pick

3    somebody good to do that, to be his appeal counsel or would

4    Your Honor prefer I make that motion to the 9th Circuit?

5    Whatever the Court wants.

6          THE COURT:  I think you need to make it to the 9th

7    Circuit.  But, I mean, I think --

8          MR. KATZ:  The clerk's saying 9th Circuit.

9          THE COURT:  No, the clerk is saying that's true

10   cause the motion has to be made to the 9th Circuit.  I am

11   going to relieve you only as of the time counsel comes in for

12   Mr. Mohammed.

13          MR. KATZ:  For the appeal.  Understood, Your Honor.

14          THE COURT:  Okay.  And then you had a second thing.

15          MR. KATZ:  Your Honor, yes.  And I don't mean to

16   dwell on this, but I made a motion to strike those couple of

17   pages from the government's filing on Thursday.  I think

18   that's an appropriate motion.  I don't have any other remedy.

19   I don't think that should be part of the record.  It is an ad

20   hominum attack that is relevant to nothing except Mr. Stern

21   venting in a really very unprofessional way.

22          THE COURT:  Well, I'm not -- since it's filed under

23   seal, I am not going to move -- I'm not going to strike

24   anything.  I think we are where we are.  I am mindful that

25   the statements of Mr. Stern were probably not as judicious as

1    I would have like them to have been, but I'm not prepared to

2    strike part of the memorandum at this stage because I need to

3    have the pages before me.  It may be material on appeal.  And

4    so for all those reasons, I'm going to permit them to remain

5    because I suspect that there are certain arguments that

6    you're gonna want to make or someone, an appellate lawyer's

7    going to want to make, and those pages may be important to

8    the record.

9            MR. KATZ:  Well, that's over my objection.

10           THE COURT:  Okay.

11           MR. STERN:  Any remaining counts I move to dismiss

12   at this time.

13           THE COURT:  All right.  The Court will grant this

14   motion.

15           MR. KATZ:  Your Honor, I don't know exactly what

16   the procedure is, but if Mr. Mohammed could have a few

17   minutes with his family.  He's not --

18           THE COURT:  I'm going to ask the marshals to permit

19   that.  I know you have to get him back to MDC.

20           Can the marshals work that out from a security

21   point of view?  Thank you.

22           MR. KATZ:  And I don't have to specifically ask,

23   but he get like a hug?  Because I think -- not from the

24   Court.  I mean if the Court approves that he get a hug

25   because I think sometimes that's an issue.

UNITED STATES DISTRICT COURT

1          THE COURT:  Well, I'm not going to get involved in

2     that.  I just think -- I'm going to permit them to remain

3     here in the courtroom, and the marshals will remain and let

4     him spend time with his family.

5          MR. KATZ:  Okay.  Thank you, Your Honor.

6          THE COURT:  Thank you.

7          MR. KATZ:  Thank you for taking all the time this

8     afternoon.

9          THE CLERK:  This court is adjourned.

10          (Proceedings were concluded at 5:30 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

COUNTY OF LOS ANGELES        )

                             )  SS.

STATE OF CALIFORNIA          )


I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED

STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,

DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE

FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET

FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN

FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO

FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION

OF MY STENOGRAPHIC NOTES.


DATE: _Nov. 6, 2006_

_____

LAURA MILLER ELIAS, CSR 10019

FEDERAL OFFICIAL COURT REPORTER


UNITED STATES DISTRICT COURT