1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                    - - -

4     HONORABLE CHRISTINA A. SNYDER, JUDGE PRESIDING

5                    - - -

6   UNITED STATES OF AMERICA,

7                 Plaintiff,

8            vs.                    No. CR 02-03(B)-CAS

9   KHALIL MOHAMMED, et al.,

10                Defendants.

11   _____

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                     EXCERPT

17              Los Angeles, California

18               October 17, 2003

19

20

21

22

23          ARLENE F. VAUGHN, CSR, RPR
            Official Court Reporter
24          312 North Spring Street
            Room 442
25          Los Angeles, CA 90012
            213.621.0377

*FILED*
CLERK, U S DISTRICT COURT
NOV - 3 2003
CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

ORIGINAL

Entered on ICMS 11/6/03

2

1    APPEARANCES:

2

    On behalf of the Plaintiff:

3

        MICHAEL J. STERN, ASSISTANT UNITED STATES ATTORNEY
4        312 North Spring Street
        1400 United States Courthouse
5        Los Angeles, California 90012
        (213) 894-3898
6
        CHRISTOPHER BRUNWIN, ASSISTANT UNITED STATES ATTORNEY
7        312 North Spring Street
        1400 United States Courthouse
8        Los Angeles, California 90012
        (213) 894-4242
9

10   On behalf of Defendant Khalil Mohammed:

11       DAVID A. KATZ, ATTORNEY AT LAW
        433 North Camden Drive
12       Suite 600
        Beverly Hills, California 90210
13       (310) 288-1995

14

15   The Interpreter:

        HISHAM MALEK, Certified Arabic Interpreter
16

17

18

19

20

21

22

23

24

25

3

1    LOS ANGELES, CALIFORNIA - OCTOBER 17, 2003 - 11:46 A.M.

2                    *   *   *   *

3              THE COURT:  I will keep that in mind.  Now we

4    are done with that.  What do we have left?  The bail

5    motion?

6              MR. STERN:  The bail motion.

7              THE COURT:  I know you won't be surprised,

8    Mr. Katz.  I know you have proposed many terms and

9    conditions, but I just think that the risk of flight is

10   such that there is no set of circumstances under which

11   bail should be permitted at this point in time and I am

12   very much persuaded by what the probation or, I should

13   say, pre-trial service officer has to say.  So I'm going

14   to let you argue.

15             MR. KATZ:  Thank you, Your Honor.  There's a

16   couple of aspects to our position.  One is I concede,

17   for the purpose of argument, that if we were proceeding

18   under the normal Bail Reform Act that we might fall just

19   short of persuading the Court that these are conditions

20   or a combination of conditions that would get us to that

21   point.  We've cited a line of authority that has to do

22   with due process which is not decided under the bail

23   reform act and, of course, the bail reform act has to

24   cede in the face of the requirements of the

25   constitution.

4

1      THE COURT:  I'm well familiar with that line

2  of cases and I understand that your client has been in

3  custody for a substantial period of time, but it's for

4  certainly a period of time that most cases in most

5  courts does not reach the point of impinging upon due

6  process.

7      MR. KATZ:  Your Honor, the point I wanted to

8  make about those cases is that actually there are a lot

9  of cases -- there's that really incisive opinion from

10 the Northern District of California.  There's cases from

11 all over.  This isn't some like errant judge that we

12 found somewhere.  These are a consistent line of cases.

13 They're from all over the country.  And they're

14 releasing people when we get into this ball bark, when

15 we get into the ballpark between 18 and 24 months, which

16 is where we are.

17     THE COURT:  Usually more than that, but okay.

18     MR. KATZ:  All of them, Your Honor, by

19 definition, were ones where the defendant couldn't be

20 released under the normal Bail Reform Act.  Had they not

21 been such cases, had they been cases where Bail Reform

22 Act analysis would have resulted in the release, the

23 person wouldn't have been in jail 18, 24 months later

24 asking for release and getting it under due process

25 analysis.

5

1          So when we turn to this issue of flight, what

2    we're really looking for is we're looking for those

3    cases as a factor in due process analysis.  We're

4    looking at those cases where the risk of flight is so

5    great or the danger is so great that it really just

6    skews the balance of due process analysis against the

7    defendant and away from granting bail.  That's not this

8    case, Your Honor.

9          First of all, we are proposing a list of bail

10   conditions that is the most stringent in any published

11   case in the country.  And I'll tell you why I can say

12   that.  Because I've gone through the published cases in

13   the country and I've taken every condition imposed in

14   every one of the cases and I have proposed it here.

15          THE COURT:  They are very stringent.  They

16   just, in my judgment, are not sufficient.

17          MR. KATZ:  Your Honor, let me just talk about

18   a couple of them, if I may.  One, there would be a

19   waiver of any right to fight extradition anywhere in the

20   country.

21          THE COURT:  I noted that.

22          MR. KATZ:  I'm not an expert on extradition

23   law, but it seems to me that it's quite different, even

24   in a country that might otherwise not be that friendly

25   towards extradition request to say this is not just a

6

1    request the United States is making.  You have the

2    defendant's signature right here that he waives any

3    defense in any country to being extradited.

4         THE COURT:  What if the defendant tells that

5    country "I was forced to do it.  I was under duress,"

6    and so on and so forth, "and I really don't want to be

7    extradited"?  Theoretically you have someone to talk

8    about, but in practice it may not work.

9         MR. KATZ:  It satisfied the one court that I

10   think -- the People's Republic I don't think has an

11   extradition treaty.  Or maybe it's Taiwan.  It satisfied

12   the judge in that case where the person was from a

13   country that had no extradition treaty at all.  And it

14   might have been Taiwan, which we don't recognize.  So it

15   presents huge problems.  And the judge at least there

16   thought that that was sufficient to tip the balance.

17        We've also suggested having his brother, who

18   is here again in court, and his fiance, who is here, act

19   as third party surreys.  Their obligations would be so

20   strict that there would basically be no way that

21   Mr. Mohammed could leave without both of them going to

22   jail for contempt because they would not have

23   supervised, not called, not prevented it, and not been

24   with him.  Basically, someone's got to be with him 24

25   hours day.  So the minute he walks out the door, if he

7

1    were to do that, if they're not on the phone or they're

2    not grabbing him and preventing it, they're in contempt.

3    I don't think you've seen that, Your Honor, in many

4    cases.

5              THE COURT:  I don't know if that's contempt

6    that would hold up.  If you want to talk about due

7    process, that really raises some due process issues.

8              MR. KATZ:  I'll tell you this, Your Honor.

9    I've dealt with some cases with the government.  They

10   can be awfully hard-nosed and his fiance could find

11   herself in jail for quite awhile fighting that contempt.

12   And if she won in the Ninth Circuit, one day that might

13   be nice, and she might spend months and months in jail

14   first away from her eight children.  Looking at the

15   impact on his mind, if he's going to leave the mother of

16   eight children away from the kids and in jail fighting

17   the government with a public defender, that's the impact

18   on his mind in assessing flight risk.

19              Likewise his brother.  My client's brother

20   Abdallah is in jail.  This is Ibrahim.  He doesn't have

21   any trouble with the law.  All of a sudden his third

22   brother, who has no trouble with the law, would find

23   himself in jail.  That would have a huge impact on him.

24   On top of that, my client's brother has gone through

25   every exertion you can imagine, Your Honor, to be able

8

1   to post this $35,000.  He would be utterly financially

2   ruined.

3          The government says well, there's probably

4   money abroad, there's this or that..  They don't have a

5   scintilla of evidence of any money abroad or any ability

6   to reimburse this fellow, who would lose his life

7   savings.

8          He's very eager to defend himself in this

9   case.  I think that we have shown the Court that there

10  really is a lively issue, a triable issue in this case,

11  not whether my client knew that there were boxes going

12  back and forth and that he was involved in wanting to

13  make money off these boxes going back and forth, but

14  that he knew that what was in those boxes would be used

15  to manufacture methamphetamine.  That's what's absent

16  from these tapes.  That's what they're going to have to

17  rely on, some of these snitches, desperate men from the

18  MDC for in their case.

19         My client is eager to take this case to trial

20  and defend himself on that critical element that the

21  government is going to have trouble proving in this

22  case.  So he's someone who's excited about the trial,

23  he's exited about the motions, he's not excited about

24  being a fugitive.  In my experience, Your Honor, they

25  get these fugitives back even if everything else -- you

9

know, they run out of money, they go to Europe.  I bet
their batting average of getting, quote, fugitives back
is somewhere north of 99 percent.  My client understands
that and doesn't want to go.  He wants to face trial.

Then you add to that these other elements in
the balance, the tremendous difficulties that he's had
preparing this case in custody.  Even if everything is
hunky-dory now, that really doesn't address the issue.
He's had months and months of his preparation time taken
away from him.  This 19 months -- and it will be over
two years by the time of the currently set trial date.
It will be over two years.  It will be in what you call
the red zone, the area that's way -- they divide the
cases into three, the less than a year, the ones that
are between, let's say, a year and two years, which we
are very near the top of that scale -- but by the time
of trial, there's no doubt if Your Honor doesn't grant
him bail under these extremely stringent conditions,
he'll be over that over two years where they basically
say unless the government hasn't caused any of the
delay, defendants are released on bail.

Well, the government has caused a lot of this
delay.  I know it's minutia and I know it's annoying,
and if I were the judge, it would drive me crazy to have
to deal with this stuff.  But, Your Honor, they knew

10

1    before the time of the arrest -- Mr. Brunwin over here

2    went in front of a judge and it came out -- this was in

3    my supplement -- that my client was on all these Chicago

4    tapes, he was taped throughout the Chicago case, and

5    that the Chicago case was highly relevant, and they told

6    this to a judge on the record.  I just recently got the

7    transcript.  So they knew before there was ever an

8    arrest, before my client's pre-trial detention

9    started -- they knew that the Chicago tapes were

10   extremely relevant to this case.  So when did they give

11   them to us?  Fourteen months after my client's pre-trial

12   detention started.  And then they come in and they tell

13   Your Honor -- and they're not forthright about it --

14   that all of this very late discovery, all of this stuff

15   that was produced ten months after he was in pre-trial

16   detention, 13 months after, 14, 15 months into his

17   pre-trial detention were plea agreements.  No, they

18   weren't.  We're talking about CDs.  We're talking about

19   tapes.  We're talking about thousands of pieces of

20   paper, Your Honor.  It's lots and lots of stuff they

21   couldn't be bothered to go get.

22           This is a very fair remedy, Your Honor.  We

23   could be here asking to dismiss the case.  We could be

24   here asking to preclude evidence.  We could be here

25   asking for a lot of things.  The Court can fashion a

11

1    fair remedy, and the fair remedy is just that his

2    pre-trial detention stops so that he and I can work on

3    this case in a way that we can devote a lot more hours

4    to it, get ready by January, and make up for some of

5    this time they caused us to lose.  It's the Government.

6    MDC and the United States Attorney's office are all the

7    Government for due process analysis, and they point

8    their fingers at each other, Your Honor.  That's

9    irrelevant.

10        My client was put out in Kern County for

11   months where he couldn't prepare this case at all.  And

12   all the defense attorneys -- that's not just me --

13        THE COURT:  That's why I ordered everyone back

14   to MDC.

15        MR. KATZ:  Right.  But he lost months during

16   that time, months of pre-trial preparation.

17        Then they sent him out to San Bernardino.

18   This was something that plays into this due process

19   analysis.

20        THE COURT:  That's why I ordered his return

21   from San Bernardino.

22        MR. KATZ:  And he lost another couple of

23   months.  And then they put him in the hole.  It's like

24   okay, you got an order from a judge, counsel, you're

25   pretty smart, so boom into the hole your client goes.

12

1   He was in the hole for over a month with all these

2   further impediments, really making it impossible to

3   prepare.  And then just as we were ready to have the

4   Court hear our motion to transfer him out of the hole,

5   they finally transferred him out of the hole.

6          Then there's this deposition record.  They

7   have to think this stuff through.  In these cases where

8   due process analysis resulted in the client staying in

9   jail, even going toward two years or over two years, the

10  government was able to come in and say, look, here was

11  our plan to make sure that he was able to prepare in

12  jail.  They were the exact opposite.  They almost had a

13  plan here, expressly or not, to make it difficult for

14  him to prepare.  Those due process cases aren't ones

15  where a defendant was put miles and miles away where he

16  couldn't prepare and was away from his counsel.  They

17  were ones where a defendant was kept right at the MDC,

18  right in the place, he was able to prepare, the

19  discovery was turned over early, the government made it

20  easy to access their discovery.

21         They weren't cases like here, Your Honor,

22  where they not only don't have indexes to help us get

23  through this stuff, but they have removed, in a case

24  where they want pre-trial detention, where they've

25  gotten it for over two years if you're denied bail --

13

1    they have taken indexes out of material.  And when you

2    write them a letter about it, they say:  Well, I guess

3    you'll just have to review every single page.  We're not

4    here to do your homework.  That's true, but the remedy

5    should then tend toward release on bail, Your Honor.

6         And that's the situation.  We have a very long

7    period of detention.  It's going to be over two years by

8    the time of trial.  We really do have a combination of

9    conditions that would work here.  We're not talking

10    about -- actually, here's the interesting thing.

11         THE COURT:  You're going to have to wrap it up

12    because I've got to go.

13         MR. KATZ:  Okay.  Your Honor, we're not

14    talking about a decision that would actually affect a

15    lot of people even at this point.  The Courts, I guess,

16    are always worried that if I release him, other people

17    are going to come in with the same argument.  Over 20 of

18    the co-defendants have pleaded guilty, so that's totally

19    different.  They're not innocent pre-trial detainees.

20    They're guilty people who are going to get a sentence

21    and they're just waiting for sentencing.  And my client

22    is a citizen, which makes him like many of I guess it's

23    the ten who haven't pleaded guilty.  He's a citizen.

24    He's someone who has led a very productive life here

25    before this problem started, which was really a gambling

14

1    problem.

2           I'll wrap it up, Your Honor.  But I believe

3    that he's someone who, under the due process analysis,

4    really should be granted bail.  And he'll be here, Your

5    Honor.  He won't run away.  He won't jeopardize

6    everything.  He'll be here and he'll face trial.

7           Thank you.

8           THE COURT:  Thank you, Mr. Katz.

9           Mr. Stern.

10           MR. STERN:  Your Honor, I need to respond to

11    some of the factual inaccuracies that came from Mr. Katz

12    because my guess is there's going to be a appeal.  So I

13    need to be able to cite --

14           THE COURT:  I know that.  You've got about

15    five minutes to do it.

16           MR. STERN:  Okay.

17           First of all, defense counsel claims that the

18    government intentionally hampered him by trying to

19    remove indexes from its discovery.  What he's really

20    talking about is that Detroit, as a practical matter,

21    goes through the last page of a report and marks over

22    the names with magic marker of the people that are

23    contained within the report.  That's what Detroit does.

24    I didn't change anything when we received the material

25    from Detroit.  We simply turned it over to defense

15

1     counsel as we received it.

2          There was no volumed index of the discovery

3     and defense counsel appears to be unhappy that he

4     actually has to read the report to see whether or not

5     his client's name is in it.  That isn't some intentional

6     attempt by the Government to stop him from understanding

7     the discovery, number one.

8          Number two, defense counsel claims that the

9     Government has intentionally withheld CDs from the

10    Chicago wire tap and they related to Defendant Khalil

11    Mohammed.  He says that the Government didn't turn over

12    the CDs until February of 2003.  He is wrong.  When he

13    tells this to the Court and when he writes it in his

14    paper, it is false.  And what he has done is he's taken

15    some of the Government's correspondence and taken those

16    things that he feels are helpful to him and neglected

17    the others.

18          The Court indicated I could respond to this at

19    the hearing rather than writing yet again another

20    response.  And I'd like to introduce to the Court

21    Government's Exhibit number 1, which I'll provide to

22    defense counsel.  If I may introduce it to the Court, as

23    well.

24          THE COURT:  You may present it.

25          MR. KATZ:  Just for the record, we'll object.

16

1    They could have given it to us.  I've been here for a

2    half hour before the Court took the bench.  They could

3    have given it to us then.

4              THE COURT:  Your objection is noted for the

5    record.

6              MR. STERN:  Of course Mr. Katz could have

7    given us every reply he filed on the day of the hearing,

8    but he --

9              THE COURT:  Okay, everyone.  Knock it off.

10             MR. STERN:  In defense counsel's supplemental

11   reply, which was filed on October 9th at 1:06 p.m., the

12   first page indicates that "not until February 19, 2003,

13   over 13 months after the indictment, AUSAs Michael Stern

14   and Chris Brunwin turned over the wiretaps of him

15   speaking with the twins" -- that refers to the Esawis --

16   "and other alledged co-conspirators in Chicago."

17             That is false.  As the letter that I provided

18   to the Court indicates, November 18, 2002, was the date

19   that the Chicago wiretaps were turned over.

20             Let me point out to the Court there was no

21   request, no discovery request by defendant for the

22   Chicago wiretaps until he joined a motion that was filed

23   by Mufid Isa, which was referred to as the omnibus

24   discovery motion, which was filed in October.  And

25   defendant joined it in October and the Court scehduled a

17

1  hearing to resolve the issues in that, I believe, on

2  November 15.

3          On the same day that the Court scheduled the

4  hearing, the Government arranged to insure, even though

5  we had not been ordered to, that the CDs from Chicago go

6  to Copy Pro.  We knew that there may be a couple days

7  for them to be copied, so we indicated that they would

8  be available on November 18.

9          So this allegation and what defendant refers

10  to as some type of smoking gun, a transcript that he

11  found in which Mr. Brunwin indicated that he was told

12  that Khalil Mohammed was picked up in the Chicago wire,

13  is not accurate.  The information was provided to him

14  and available to him in November of last year.

15          And this is what I find to be particularly

16  interesting.  It wasn't until February of the next year,

17  months after they had been sitting at Copy Pro, that

18  defense counsel went to Copy Pro and got them.  In fact,

19  if you look at one of the attachments --

20          THE COURT:  I'm seriously going to get up and

21  leave because I have to leave.

22          MR. STERN:  I understand.  The point I'm

23  trying to make is he's been complaining that the

24  Government has been impeding him.  He let the disks sit

25  at Copy Pro for months and didn't pick them up.  The

18

1   whole design of his argument relating to not being able

2   to read the CDs or understand them, even though they've

3   always been available and clearly they were opening up,

4   is to try and dovetail some type of due process argument

5   into his bail motion which he then anticipates appealing

6   to the Ninth Circuit.

7           And the problem is that unless we respond to

8   these individually, the record that we're going to be

9   citing is incomplete.  So my suggestion is this.  3142

10  Subsection I requires the Court to make written findings

11  of fact with respect to detention issues.  I would like

12  the opportunity to draft a proposal for the Court, or if

13  the Court wants to do it, we can file an opposition

14  paper on it.  But I'm willing to draft the proposed

15  order so that the record be complete with respect to the

16  factual issues and the Court's conclusions so that when

17  defendant appeals to the Ninth Circuit, we will be able

18  to at least cite to the record and not be in a situation

19  where Mr. Katz has made a variety of inaccurate

20  allegations that we can't respond to.

21          THE COURT:  Here's what I'm going to do.

22          MR. KATZ:  May I have one minute?

23          THE COURT:  No.

24          Number one, I understand you disagree with

25  everything that has been said by the Government counsel.

19

1          MR. KATZ:  And the records transmitting

2     discovery are right in here.  They're part of the

3     supplement.  They're the Government's letter saying only

4     now is Chicago available.  Only now is Detroit

5     available.

6          THE COURT:  Mr. Katz, I'm serious.

7          Secondly, Mr. Stern, you may submit proposed

8     findings.  I want you to serve them on Mr. Katz so he

9     has an opportunity to make whatever objections.

10          MR. STERN:  I understand.  The problem is

11     we're going to get into another battle:  I object to

12     this.  Let's have a hearing to see whether or not --

13          THE COURT:  We're not going to have a hearing.

14     The objections are going to be in writing by Mr. Katz.

15     Mr. Katz has no difficulty writing things, we've

16     learned.  But here is my feeling on this matter.  One, I

17     do not think that the record reflects the improprieties

18     by the Government that Mr. Katz is suggesting, nor the

19     improprieties by MDC.  This has not been a case where

20     people have moved defendants around for improper

21     purposes.  And in the normal set of circumstances I

22     would have let people remain in Kern and people remain

23     in San Bernardino, but I knew it was a burden on counsel

24     to travel to try to work with their clients and counsel

25     in this case were busy and needed the time with their

20

1    clients.

2          Secondly, I think the Government has provided

3    documents promptly.

4          Third, I think there has been some slowness in

5    going to Copy Pro to pick up disks, not because anyone

6    is doing anything immoral or fattening or anything else,

7    but simply because, Mr. Katz, you're quite busy, you've

8    been involved in trials and I think sometimes you've not

9    been as prompt as you would have liked to have been.

10         Third, and more to the point, though, I do not

11   think there is a due process violation at this stage.  I

12   recognize the case law, but if I were to find a due

13   process violation, in my judgment the remedy would be

14   something much different than releasing Mr. Mohammed

15   from custody.  I mean I think if I really found a due

16   process violation in this case I would be looking at

17   sanctions such as dismissing the indictment or

18   dismissing portions of the indictment rather than bail.

19   I just think the record is overwhelming as to why bail

20   is inappropriate in this case.  And those are my

21   fundamental thoughts on the matter.

22         MR. STERN:  Thank you.  I'm assuming that the

23   Court is finding the defendant a flight risk and danger

24   to the community.

25         THE COURT:  I am.

21

1          MR. STERN:  Consistent with the pre-trial

2    services report.

3          THE COURT:  I am.

4          MR. STERN:  I would like to be able to cite

5    portions of the pre-trial services report in my proposed

6    order, as the Court typically relies on it.

7          THE REPORTER:  Would you slow down.

8          THE COURT:  Slow down.

9          MR. STERN:  I know you have to get out of

10   here.

11         And I will file the proposed order which I'm

12   going to ask be incorporated into this hearing, and I'll

13   try and file it by the middle of next week.

14         MR. KATZ:  I would object to that because

15   neither side is allowed to have a copy of the pre-trial

16   services report, and if we're furnished with one, both

17   of us, if the Court wants to make an exception, there's

18   parts of it that would help my position.  There's parts

19   I would love to cite to.

20         The last thing I would like to mention on the

21   flight risks, since this is the last time we have to

22   address the Court, and I made this point, but I forgot

23   to repeat it today.  A lot of people have gotten bail in

24   pseudoephedrine cases, including this other major

25   companion case that they cited to the Court to try to

22

1    knock me out.  The lead defendant got bail --

2              THE REPORTER:  I'm sorry.  You'll have to slow

3    down.

4              THE COURT:  You have to go to the lecturn and

5    speak at the lecturn and you've got to speak slowly.

6              MR. KATZ:  All but two defendants, Your Honor,

7    in that companion case, which they say is every bit as

8    big as this -- they're touting three tons in that case.

9    Everybody has gotten bail except someone who was

10   involved in a shootout and an illegal alien.  In the

11   Chicago case that are companions to both these two big

12   cases here, lots of people have gotten bail and nobody

13   has run away.  Nobody had fled who got bail in those

14   cases.  I'd ask the Court to take that into

15   consideration

16             THE COURT:  I would take it into

17   consideration, but keep in mind I'm concerned about the

18   facts of this case.  I don't know the facts of that

19   case.  If you want to argue all of that on appeal, I

20   think you should.  But in my judgment, the facts in this

21   case suggest that the danger to the community and the

22   risk applied are such that it is inappropriate to grant

23   bail and I do not see that there is a due process

24   violation, as you suggest.

25             MR. KATZ:  I understand the Court's ruling,

23

1    Your Honor.

2           THE COURT:  Thank you.

3           MR. STERN:  Your Honor, with respect to the

4    pre-trial reports, I've noted some of the things I

5    wanted.  I don't need the physical report.

6           THE COURT:  I don't know that you need the

7    report, per se, unless you want to give it to Mr. Katz.

8    And I think you're going to invite another flurry of

9    paper that none of us really wants.

10          MR. STERN:  I'll just use the notes that I

11   made.

12          THE COURT:  I think you should do that.

13          MR. STERN:  Thank you.

14          MR. KATZ:  Thank you for taking the time, Your

15   Honor.

16          (Proceedings concluded at 12:10 p.m.)

17          I certify that the foregoing is a true and

18   correct transcript of the stenographically recorded

19   proceedings in the above-entitled matter.

20

21   _____         *October 30, 2003*
                                              (date)

22   Arlene F. Vaughn
     Official Reporter

23

24

25